JOHN C. ORRELL ET AL. *v.* BAY MANUFACTURING COMPANY.

1. PUBLIC LANDS. *Homesteads. Revised Statutes U. S., § 2291. Alienation.*

The statutory prohibition of the alienation of public lands by parties who have taken the preliminary steps to acquire the same under the homestead laws, and who have not perfected their entries, has reference to an absolute sale of the lands or some part thereof.

2. SAME. *Leasing of trees for turpentine purposes. Sale of timber.*

The leasing of trees on the land for turpentine purposes and the sale of trees, by homesteaders who have not perfected their entries, is not an alienation within the meaning of Revised Statutes of the United States, § 2291.

3. SAME. *Rights of homesteaders.*

The rights of homestead settlers, after preliminary certificates of entry and before final proof is made, are:

(*a*) To occupy the land, to protect it from trespass by others and to use it for all purposes incidental to its cultivation, with the view of complying with the homesteader's obligations to the government arising from the entry;

(*b*) To cut and remove timber from the land only when necessary for its improvement in the ordinary course of preparing his "farm for tillage," and not for purposes of speculation or profit; but

(*c*) A lease of trees for turpentine purposes is not forbidden by any statutory provision.

4. PUBLIC POLICY. *Specific performance. Equity.*

The specific performance of a contract for the lease of trees on the homestead for turpentine purposes by a homesteader who has not perfected his entry will not be denied by a court of equity on the idea that such a contract is violative of the public policy of the government, since such leases are not prohibited either expressly or by fair implication by any statute, nor by the decisions of the federal courts construing the subject-matter, nor by the rulings of any department or officer of the government, nor do they thwart its policy.

5. SAME. *Estoppel.*

> All contracts in reference to homesteads, under the laws of the United States, not in violation of express statutes or fundamental principles of public policy, although made before the issuance of the patent, may be enforced after its issuance, and such contracts are within the "efficacious reach of the doctrine of estoppel."

FROM the chancery court of Hancock county.

HON. STONE DEAVOURS, Chancellor.

The Bay Manufacturing Company, appellee, was the complainant in the court below; Orrell and others, appellants, were defendants there. From a decree declining to dissolve an injunction the defendants appealed to the supreme court. The facts are fully stated in the opinion of the court.

*Barber & Mize,* for appellants.

By agreement of counsel there is but one question to be decided by the appellate court in this case, viz.: Whether or not the lease made by the Hodes to J. C. Orrell of the timber growing on the land named in said lease, for turpentine purposes, on February 17, 1903, when said Hodes were the legal owners of said land, having previously completed their homestead entry and obtained final certificates, is superior to the lease made by said Hodes of said land for turpentine purposes to Leatherbury & Co., under whom the Bay Manufacturing Company claims, on July 31, 1899, when the Hodes were holding said land under incomplete homestead entry, having only a short time previously filed their initial claim for homestead entry thereon.

The manifest object of the homestead entry law of the United States is to enable the citizen to obtain a home for himself and family unincumbered at the time the title passes from the United States government to the patentee.

Section 2288, revised statutes United States, as amended by sec. 3, of the act of March 3, 1891, p. 942, says that no part of the land entered for homestead can be alienated except for church, cemetery, or school purposes, or for the right of way of

railroads, canals, or ditches for irrigation or drainage across it. The lease made by the Hodes to Leatherbury & Co. does not fall within the list of authorized alienations.

The pre-emptor, before final proof and receipt of final certificate, has only the right to cut and use such timber on the homesteaded land as is reasonably necessary for the clearing, fencing, cultivation, and enjoyment of the same. The statute does not contemplate that the pre-emptor, before final proof, shall become the agent of some corporation, partnership, or person prohibited from taking advantage of the homestead law. Were the pre-emptor allowed to lease the timber on the land entered for turpentine or saw mill purposes that class of natural and artificial persons debarred from making use of the provisions of the homestead law would have their agents on every foot of the public domain under the pretense of availing themselves of the statute's generosity, and such agents, after entry, would sell the timber or its use on the lands belonging to the government and then, like the Arab, fold their tents and silently steal away, caring little or nothing for final proof or patent. The pre-emptor is therefore required by the statute to make oath on filing application that same is made in good faith and not for the benefit of any other person or corporation, that he is not the agent of any other person or corporation to give them the benefit of the land entered or the timber thereon, and he is prohibited from conveying any part of the land or timber thereon except for purposes cited *supra,* before final proof.

Any contract made in derogation of a statute is null and void. *Bartlett* v. *Vinor,* Carth., 252; *Bohn* v. *Lowery,* 77 Miss., 424, 34 Ark., 762.

Growing timber on the land is part and parcel of the realty. Because of the ravages traceable to the woodman's axe, and the easy yielding to fire and worms of pine forests that have been hacked, cut, and sapped of life for turpentine purposes, a turpentine lease lessens and destroys the value, to a large extent, of realty on which it is given by the dire destruction of the tim-

.ber, and, by destroying timber from the public domain, while the title to said land is still in the government, much of said lands is rendered worthless.

The right of the pre-emptor is one of occupancy only, with rights and privileges subject to his duty to the government to protect the timber on said land. He has no right to cut the timber for sale or speculation or to lease it for turpentine purposes until he has made final proof entitling him to patent. The Hodes, at the time they leased the land for turpentine purposes to Leatherbury & Co., had no title to the land and had no right to make said lease, it being void as against public policy. *Shivers* v. *U. S.,* 159 U. S., 491; *Frisbie* v. *Whitney,* 9th Wall. (U. S.), 187; *Co.* v. *Donnelly,* 34 Ark., 762; *U. S.* v. *Taylor,* 35 Fed. Rep., 485.

The doctrine of estoppel does not apply against the Hodes because said lease was utterly null and void, nor could any title which the lessors might afterwards obtain inure to said lease and make it valid. The first lease being void as against public policy, under the Federal statute, the lease made by the Hodes to J. C. Orrell after they obtained title to the land, is a good and valid lease.

Any conveyance or any contract to convey land homesteaded made before final proof and receipt of final certificate is void, and not merely voidable, although founded on an adequate consideration, and a court of equity is without power to give relief. *Anderson* v. *Carkins,* 135 U. S. Rep., 483; *Mulloy* v. *Cook,* 10 So. Rep., 349; *Mulloy* v. *Cook,* 17 So. Rep., 899; *Dewhurst* v. *Wright,* So. Rep., 682; *Milliken* v. *Carmichael,* 33 So. Rep., 9; 134 Ala., 623; *Woodson Iron Co.* v. *Strickland,* 121 Ala., 616; *Metlison* v. *Allen,* 30 Kan., 382; *Dawson* v. *Merrille,* 2 Neb., 119; *Oaks* v. *Heaton,* 14 La., 116; *Nichols* v. *Council* (Ark.), 9 S. W. Rep., 305; *Clark* v. *Bailey,* 5 Ore., 343; 5 Minn., 192; *Kansas Lumber Co.* v. *Jones,* 32 Kan., 195; *Seymour* v. *Sanders,* 3 Dillon (8th Circuit), p. 437.

*Anderson* v. *Carkins,* cited *supra,* forever sets at rest the doctrine that equity will enforce and protect a lease made before final proof, which decision has been followed by every state which has passed upon said question since the rendition of *Anderson* v. *Carkins,* with the single exception of Mississippi in the recent cases of *Sanford* v. *Estabuchie Lumber Co.,* and *Anderson* v. *Wilder,* when the question in the case at bar was not directly before the court in said cases.

We would call especial attention to the second case of *Mulloy* v. *Cook,* cited *supra,* and to *Milliken* v. *Carmichael et al.,* 33 So. Rep., 9, a case in which the facts are almost identical with the facts in this case, both being dependent for adjudication upon the question whether or not a lease for turpentine purposes of timber on land homesteaded made after final proof when the lessor has full title, will hold over a lease of the same land for the same purpose made long before final proof and when the lessor had no title and only a mere possessory right in preference to others. The supreme court of Alabama, in dissolving the injunction in said case emphatically upheld the contention urged by appellants in this case.

The case of *Butterfield Lumber Co.* v. *Hartman,* 82 Miss., 494, is not in point, for the reason that in said case the consideration paid for the sale of the timber and right of way before entry was completed, was advanced strictly on the agreement that the money was to be used in commuting the land at the end of fourteen months, thus enabling the homesteader to obtain patent and acquire a home in fourteen months, whereas otherwise he would have been forced to wait five years. No such facts appear in the case at bar.

We wish to emphasize the fact that the doctrine of estoppel does not apply in the case at bar.

While a deed by a grantor without title may give rise to estoppel, it cannot confer an estate capable of being transferred to third persons even when the result would be to deprive the assignee from obtaining redress for the grant.

A title may be good between the parties and those claiming under them until brought in contact with a superior right, when it must yield to this superior right.    Herman on Estoppel, vol. 2, sec. 848, p. 976.

Even though estoppel should apply, and it does not, between Leatherbury & Co. and the Hodes, it does not apply between the Bay Manufacturing Company, the transferee of Leatherbury & Co. and the Hodes, when the superior right of J. C. Orrell intervenes.

Statutory provisions for the benefit of individuals may be waived, but when the enactment is to secure general policy or morals, it cannot be waived.    The statutes regulating the homestead law are intended to secure a general policy of the government and cannot be waived.    Herman on Estoppel, sec. 825.

The doctrine of estoppel does not apply and cannot be pleaded in a contract against public policy.    39 L. R. A., 725; *Cox* v. *Donnelly,* 34 Ark., 762.

The doctrine of estoppel can go no further than to preclude a party from denying that he has done that which he had power to do.    Parsons on Contracts, 2 vol., sec. 800, p. 972, and authorities cited.    1 S. W. Rep., bottom p. 560.

Section 2296 is valid and binding on the state.    *Seymour* v. *Sanders,* 3 Dillon, 437.

Mechanic's lien will not attach to the land before claimant is entitled to patent.    *Kansas Lumber Co.* v. *Jones,* 32 Kan., 195.

The Hodes, having violated secs. 2288, 2290, 2291, and 2296, their contract with Leatherbury & Co. is void as against public policy, and it is a proposition admitting of no exception that contracts in violation of law and against public policy cannot be enforced, being void.    77 Miss., 424; 34 Ark., 762.

Congress has absolute right to prescribe the times, conditions, and mode of transferring the land or any part of it, and to designate the persons to whom the transfer shall be made.    No state legislature can interfere with the right or embarrass its exercise.    *Gibson* v. *Chotou,* 13 Wall., 92.

In contravention to the contention of appellee that the leasing of timber on homesteaded land before final proof is not an alienation, we would cite *Shivers* v. *Shivers,* 159 U. S., 497. "With rescept to standing timber, his (the pre-emptor's) right is analagous to a tenant for years."

The law contemplates the abandonment of the homestead, but it does not contemplate that the pre-emptor shall ruin the value of the land for others who may thereafter enter it.

"In the United States, the criterion of waste is, do the acts complained of do a lasting damage to the freehold or inheritance, and tend to the permanent loss of the owner in fee, or to destroy or lessen the value of the inheritance." Am. & Eng. Enc. Law (1st ed.), vol. 28, p. 868.

The weight of authority is against the use of pine trees for turpentine purposes before final proof and certificate. See *United States* v. *Taylor,* 35 Fed. Rep., 485.

We submit that the appellant's contention is the road, constructed by the federal government, causewayed by public policy, and macadamized by the cases of *Anderson* v. *Carkins* (which has been twice upheld by the United States supreme court in 171 U. S., p. 657; 176 U. S., 415), and *Milliken* v. *Carmichael,* cited *supra,* to be traveled by this court in arriving at the correct decision in the case at bar, and that the Federal Reporter authorities, cited by counsel for appellee in endeavor to free their contentions and reasoning from legal destruction confronting them, are only *ignis fatuus,* "will of the wisp," leading chancellors astray into unconnected byways with which the law has no acquaintance.

*J. H. Neville, Bowers & Chaffe, McWillie & Thompson,* and *Ford & White,* for appellee.

The legal proposition that, although a grantor may not have title at the time he makes a conveyance and after acquired title inures to his grantee, is certainly so well established in Mississippi as to require no citation to authority to support it; and the

facts set out in the agreement of counsel in this case brings it clearly within that rule, unless the prohibition contained in secs. 2290, 2291, and 2296 of the revised statutes of the United States renders a contract, like the lease to complainant, by a homesteader before acquiring the government title, contrary to public policy and therefore void. We concede that as between any person claiming land, or an interest in land, under a contract with the homesteader and the government, the government can totally disregard it; that until the government finally parts with its title, it can disregard any sort of an agreement that the homesteader makes; but where the government, as in this case, transfers the title to the homesteader, any agreement made by the homesteader, anterior to the acquisition of the title, not strictly an agreement having for its object the alienation of the land and abandonment of the homestead, becomes perfectly valid and binding as between the parties. We further contend that a lease for turpentine purposes, like the one in this case, is in no sense an alienation of the homestead land, and in no way contravenes either the letter, spirit, or policy of the United States homestead laws.

The court will observe that the affidavit required of a homesteader in order to prove out his homestead under secs. 2290, 2291 and 2296 of the Revised Statutes of the United States, is quite different from the affidavit that he subscribes when the application to make the entry is made. The affidavit preliminary to making the entry recites that no person or corporation is "interested directly or indirectly with the applicant either in the land or the timber thereon," whereas the affidavit required in proving out the homestead simply recites that he has not "alienated" the land. The lease for turpentine purposes in this case was, as shown by the dates, long subsequent to the application for the entry, and therefore the only question here is whether the lease was a contract within the non-alienation provision of the statute.

The court will observe that the contract or lease from Hode,

the homesteader, to Leatherbury was simply a lease or right to use the pine trees on the land for three years for the purpose of manufacturing turpentine from the trees. That it provided that the rights to "turpentine" said trees should be exercised within fifteen years from the date of the lease, showing that it was not at all necessary that the operation of this timber for turpentine under the lease should be done during the government ownership of the land, that it moreover provided that the lease was made to enable Hode to improve the homestead. There is nothing in such a contract or lease contemplating the abondonment, by the homesteader, of the land during the time the turpentine operator is exercising his right, even though the right be exercised under the lease before the government parts with its title. It simply contemplates a qualified use of the timber, along with the use of the farm by the homesteader, and neither in theory nor in practice operates to deprive the homesteader of the property for a single moment, and therefore it is in no sense an alienation of the land. The federal courts have uniformly held that boxing pine trees for turpentine purposes is not violative of the statutes of the United States prohibiting the cutting of timber upon the public domain. *Leatherbury* v. *United States,* 27 Fed. Rep., 606; *Bryant* v. *United States,* 105 Fed. Rep., 944. In this last case, decided so late as 1901, by the circuit court of appeals for the fifth circuit, the court uses the following language:

"We think it is not a matter of common knowledge that such cutting and boxing of pine trees destroy the value of the trees as timber, or that it has a tendency even to retard the growth of the trees. It is, however, we think, a matter of common knowledge, of which we may take notice, that on March 2, 1831, and long before that date, the turpentine business was a business most prevalent in all parts of the country where there were pine trees growing upon public lands; and if it had been the intention to protect these lands from the ravages of the business it

would have been easy to make that intention clear by the use of appropriate words."

Can it be that a contract with a homesteader for such a use of the timber as would not be violative of any United States statute, even if done on the public domain and without authority, is so plainly violative of public policy as to render the contract void? It was expressly held by the supreme court of Arkansas that an agreement with a homesteader for the use of the homestead lands, and to jointly divide the profits arising from such use is not within the prohibition of the statute. *Mantooth v. Burke,* 35 Ark., 540; *H. R. S. Co. v. Tyler,* 36 Ark., 205. But this court has recently held that an agreement by a homesteader to sell all the timber upon the homestead, before he proves it out, is not within the prohibition of this statute, and that an after acquired title becomes valid and enforceable. *Butterfield Lumber Co. v. Hartman,* 82 Miss., 494; s. c., 34 So. Rep., 328. As we understand the opinion in the Butterfield Lumber Company case, this honorable court adopts the construction placed upon these statutes by those courts which have held that the prohibition is against the alienation, and not against the use of the homestead; that a contract or agreement by which the homesteader retains his home upon the land entered but simply sells the timber, or interest in timber, or other right, interest, or use, which enable him to improve it as a home, is not violative of the law, but it is valid between parties, or becomes valid upon the relinquishment of the title by the government. Vide also *Sanford v. Estabuchie Lumber Co.,* 83 Miss., 478; s. c., 36 So. Rep., 10.

In the case of *Larson v. Weisbecker,* 1 Dec. Int. Dep., 409, which was an appeal from a decision by a register of a United States land office, to the department of the interior, by a preemption entryman, whose entry was cancelled, or rather denied because it appeared that the entryman had executed a mortgage upon the land, Secretary Teller reversed the ruling, and held:

"That unless it should appear, under the rules of law applicable to the construction of contracts, or otherwise, that the title would inure to another person, it did not debar the right of entry, and that the mere possibility that the title might so result was not sufficient to forfeit the claim. That the right of entry could not be defeated by the statute under consideration, unless it appeared that there was a contract by the force of which title to the land would vest in some other person; and that such was the intention at the time of the making of the contract. On the contrary, if the mortgage was a mere security for the money loaned, and the contract did not necessarily divert the title from him it would not be considered such a contract as is prohibited by the law in question."

The execution of a mortgage is not itself an alienation, and it is not the purpose of the homestead act to protect land entered as a homestead from a lien created thereon by the person entering it. The fact that the act provides against alienation by the claimant, and does not provide against mortgaging, unless alienating includes mortgaging, indicates that it was not deemed against the public interest that the claimant should mortgage his homestead. *Fuller* v. *Hunt,* 48 Iowa, 163; *Lang* v. *Morey,* 40 Minn., 396; *Skinner* v. *Reywick,* 10 Neb., 323.

"The giving of a mortgage may result in an alienation, but is not such itself, nor can it be said that the mortgage is given for such purpose. Land is often mortgaged with the view of obviating the necessity of alienation. The office of a mortgage is simply to create a lien. Under our statute the legal title remains in the mortgagor, though possibly the case would not be different if it passed to the mortgagee. A conveyance made merely to create a lien lacks the essential elements of alienation. Even where land is public land at the date of the mortgage, but which is subsequently located as a homestead, any title subsequently acquired by the mortgagor inures to the benefit of the mortgagee, and the mortgagor is estopped from denying the lien of the mortgage and setting up that the title afterwards volun-

tarily acquired to defeat it." *Kirkaldie* v. *Larabie,* 31 Cal., 455; s. c., 89 Am. Dec., 205.

See also *Reasoner* v. *Märkley,* 25 Kan., 635; *Wilcox* v. *John,* 21 Cal., 367; s. c., 52 Am. St. Rep., 246; *Meinhold* v. *Wayers,* 102 Wis., 389; s. c., 72 Am. St. Rep., 888. There is a line of decisions resting upon authority of *Anderson* v. *Carkins,* 135 U. S., 438, holding that a mortgage given by a homesteader prior to proving out his homestead is within the prohibition contained in the United States statutes and void, but we insist in those cases the courts were simply taking it for granted that such contracts constituted alienations, or there was something in the language of the contracts themselves, or some fact established in the record of the cases, that disclosed that the mortgages were simply subterfuges, resorted to to enable the parties to evade the provision of the statutes against alienation.

But the question presented in this case is not embarrassed by any of the considerations that confronted the courts in construing the mortgage contracts. Under this lease for turpentine purposes there is no possibility of the contract resulting in an alienation of the title as might result if it were a mortgage; this case, like *Butterfield Lumber Co.* v. *Hartman, supra,* could at most result in a possible reduction in value of the homestead by reason of the exercise of the right conferred, but under no circumstances could it operate as an alienation.

Not only was this turpentine lease not an alienation of the title to the land, and therefore valid, as between the parties, but when Hode, the homesteader, acquired the title, under the agreement, such title related back to the date of his homestead entry and made forever valid and binding this contract. *Anderson* v. *Wilder,* 83 Miss., 606. Not only does this rule apply in the state courts, but the federal courts have uniformly adopted the same view. The issuance of the patent, or acquisition of the title by the homesteader, relates back to the inception of his title, and not only inures to the benefit of the person holding under the homesteader, but enables him to sue for any trespasses

occurring between the date of the homesteader's entry and the date of his acquiring title. *Union Mill Co.* v. *Danberg,* 2 Sawyer, 450; *U. S.* v. *Ball,* 31 Fed. Rep., 667; *Teller* v. *U. S.,* 117 Fed. Rep., 577. In this last case, a circuit court of appeals opinion, the appellant, Teller, bought some timber upon a mining claim entry (which is governed by practically the same statutes as apply to homestead and pre-emption entries) from one Mulison the entryman, and before Mulison had perfected the entry and acquired the title Teller entered upon the land while still the property of the United States and cut all the timber off under his purchase from Mulison and was indicted for cutting timber off government lands, tried and convicted. After his conviction he was sued by the government for twenty thousand dollars, the value of the timber cut and removed, but in the meantime Mulison had perfected his entry and acquired the title from the government. Teller pleaded in defense of this suit that Mulison's title, when he acquired it, related back to his entry and made good his own intermediate contract for the purchase of the timber. The circuit court held this plea bad, but the circuit court of appeals overruled this decision, holding that under the doctrine of title by relation, when Mulison acquired the title it related to its inception, the date of his entry, and rendered his contract with Teller for the sale of the timber valid and protected Teller from suit, although he had already been convicted for the criminal offense of cutting timber while the land remained the property of the United States. The same prohibitions against alienation, etc., applied to that entry as to homestead entries, and yet the court says in its opinion:

"Defendant's purchase of the timber from Mulison to enable him to perform his contract with the government and obtain his title to the land was lawful and unobjectionable had he allowed the timber to stand until Mulison had so obtained the title."

We understand from this that a simple agreement to sell the timber which does not contemplate its removal while the title is in the government, not being a contract for the alienation of the

land, is perfectly valid between the parties. And in this case, the lease to Leatherbury, reciting as it does that it was made to enable the homesteader to improve his homestead, and no more contemplating the forbidden alienation than if it were a lease for the pasturing of sheep or cattle, and having been actually followed by the proving out of the homestead, and the retention of the land as a home by the homesteader is unquestionably, as between the parties, a valid, binding contract, and the appellant, Orrell, who had full legal notice of the existence of the lease stands in no better attitude to assail it than Hode, the homesteader.

The title of Hode under his patent seems to be attacked because of fraud in procuring the same. This is not permissible for two reasons. (1) Hode is the common source of title. (2) Patents are not subject to collateral attacks. 79 Fed., 577; 173 U. S., 702; 16 Fed., 348; 13 Fed., 217. The contention of the appellant is that the homesteader had "alienated" the land, or in other words, procured the patent by fraud. A patent is conclusive as against everybody except the government. 106 U. S., 447; 67 Fed., 948; 21 Ib., 200; 65 Ib., 329.

The government may attack and set aside a patent for fraud in procuring same, but the frauds must be extrinsic or collateral to the matter tried and determined, upon which the patent issued, and not fraud consisting of perjury in the matter on which the determination was made. Even if Hode's affidavit that he had not alienated the land were false and perjured, the patent could not be successfully assailed on account thereof, because the fact of alienation was in issue and was determined in favor of the homesteader by the issuance of the patent. The non-alienation of the land is *res adjudicata* as to the only persons concerned, that is to say, Hode and the government. *U. S.* v. *White,* 17 Fed., 561; *U. S.* v. *San Jacinto Tin. Co.,* 23 Fed., 279.

In the case of *Butterfield Lumber Co.* v. *Hartman, supra,* the timber on the land was sold to get money to complete the pay-

ment on the land, while in the present case the turpentine lease was to enable the entryman to improve his homestead. The purpose for which the money was procured was not the controlling idea of the decision in the case cited. On the contrary, the case was decided on the view that a sale of the timber was not an alienation of the land. Certainly the object to which the money was to be applied cut no figure in the case. *Sanford* v. *Estabuchie Lumber Co.,* 83 Miss., 478; s. c., 36 So. Rep., 10. If the object or purpose to which the money was to be applied could possibly cut any figure in the transaction and affect the right of the homesteader in any way, it would be on the theory that the money was intended to be used in meeting one of the requirements of the law, and as occupancy or cultivation for five years is also a requirement, money to be used in making the land fit for occupancy or cultivation would be within the reason of the decision, bearing in mind always that the laws are to be liberally construed for the advancement of the interests of the settler. But this is an unprofitable digression from the view that a sale of timber on the land is not an alienation of the land. If a sale of the trees themselves is not an alienation of the land, how can we so classify merely the taking of a part of the gum from the trees? It would be equally reasonable to ascribe such legal effect to a contract authorizing the taking of a part of the sap from sugar maple trees, or gathering the yield from pecan, or other nut-bearing trees. There was nothing in the lease which interfered with the homesteader's right to occupy the land. On the contrary, he made it in order to enable himself to improve the land, and the homesteader in fact continued to occupy the land. The definitions of the term "alienate" given by the standard authorities fully confirms the interpretation given to it by the court below. 22 Am. & Eng. Enc. Law (2d ed.), 60.

Argued orally by *E. M. Barber,* for appellants, and by *T. A. McWillie,* for appellee.

TRULY, J., delivered the opinion of the court.

On the 31st of July, 1899, Henry Hode and his wife executed a lease contract conveying to G. S. Leatherbury & Company certain turpentine rights in the pine timber on a quarter section of land then in possession of said Hode by virtue of an incomplete homestead entry thereof. At the date of this contract the homestead entry of the said Hode to the land in question had not been perfected and no final certificate and patent from the United States government was issued until the year 1903. On the 17th of February, 1903, Hode and his wife, after the homestead entry was perfected, executed a "turpentine lease" on the same timber to J. C. Orrell, appellant, and under that lease Orrell entered on the land and began to box the timber preparatory to the gathering of the rosin from the trees. Appellee, which by assignment had become the holder of the lease granted to Leatherbury, filed its bill in the chancery court and procured an injunction restraining the appellant Orrell and Hode and wife from using any of the timber for turpentine purposes, and from in any manner interfering with or trespassing on the rights of appellee. On motion to dissolve the injunction the case was heard on the pleadings and an agreed statement of facts. The motion to dissolve was overruled, and from the interlocutory decree rendered an appeal was granted to settle the principles of the cause. On this appeal appellants contend that they are entitled to the turpentine rights in the timber in question. They base their claim on two grounds: 1. That the lease from Hode to the assignor of appellee was made while the land was yet the property of the United States government, and is therefore void. 2. Because the contract by virtue of which appellee claims is contrary to the public policy of the United States government in dealing with its homestead lands, and consequently specific performance thereof will not be decreed by a court of equity.

The lease in question is as follows: "In consideration of the sum of $50.00, the receipt of which I hereby acknowledge, I

hereby lease and convey for a period of three years from the time the boxes are cut to the firm of G. S. Leatherbury & Co., of Silver Hill, Miss., all the pine timber on my land suitable for turpentine purposes on the lands in Hancock county described as West 1-2 of Southeast 1-4 and the East 1-2 of the Southwest 1-4, sec. 20, Tp. 6, Range 15 West, lease not to exceed fifteen years. I also state that I have leased my lands for the improvement of same. Containing about 160 acres said timber to be worked by G. S. Leatherbury & Co., for turpentine, for which I am to receive the sum of $100 per crop of 10,000 boxes, the above sum of $50 being the first payment thereon, the remainder to be paid when the boxes are cut, said G. S. Leatherbury & Co., their assignees and representatives, shall have the right to work and use said boxes for a period of three years without further rental, and shall have the right of way through any and all of my lands for the purpose of cutting, dipping, and hauling same. Witness our hand the 31st day of July, 1899.

HENRY X. HODE.<br>MARY X. HODE.

The lease made to Orrell after final certificate and patent had been issued is practically identical in terms with the one above set out. In the agreed statement of facts on which the motion to dissolve was heard, it is recited, "that the question to be decided upon this motion is as to the superiority of the respective leases as a question of law." The question presented a consideration of the rights and duties of persons making application to secure homesteads in the public lands of the United States. Under section 2289 of the U. S. revised statutes, as amended by the Act of 1891 (26 Stat. at L., 1098), a settler making application for a homestead is required to file an affidavit stating that he "will faithfully and honestly endeavor to comply with all the requirements of law as to settlement, residence, and cultivation necessary to acquire the lands applied for, that he or she is not acting as agent of any person, corpora-

tion, or syndicate in making such entry, nor in collusion with any person, corporation, or syndicate to give them the benefit of the land entered or any part thereof or the timber thereon." Upon making and filing this affidavit and the payment of a certain small sum proportionate to the amount of land applied for, the entryman acquires certain rights in the land and the timber growing thereon. He acquires a privilege of pre-emption, and is clothed with the right and power to protect his entry from intrusion or trespass. While against the government he, perhaps, acquires no vested interest in the land allotted him, against all else he acquires the right to an absolute and undisturbed possession and control which, upon compliance with other provisions of the homestead law, as to occupancy, cultivation, and non-alienation, may eventually ripen into ownership. Prior to the time at which, by issuance of patent, he acquires indefeasable title to the land constituting his entry, his interest in the standing timber thereon is to a certain degree limited, and the government forbids the commission of waste, and may, under section 2461, U. S. revised statutes, prosecute criminally for the cutting and removal of trees therefrom, unless for certain recognized and necessary purposes.

In *Shivers v. United States,* 159 U. S., 491, 40 L. Ed., 233, the settlers right is stated thus: "By analogy we think the settler upon a homestead may cut such timber as is necessary to clear the land for cultivation, or to build him a house, outbuildings, and fences, and, perhaps, as indicated in the charge of the court below, to exchange such timber for lumber to be devoted to the same purposes; but not to sell the same for money, except so far as the timber may have been cut for the purpose of cultivation. While, as claimed in this case, much money might be used to build, enlarge, or finish a house, the toleration of such practice would open the door to manifest abuses, and be made an excuse for stripping the land of all its valuable timber. One man might be content with a house worth $100, while another might, under the guise of using the

proceeds of the timber for improvements, erect a house worth several thousands. A reasonable construction of the statute—a construction consonant both with the protection of the property of the government in the land and of the rights of the settler—we think, restricts him to the use of the timber actually cut, or the lumber exchanged for such timber and used for his improvements, and to such as is necessarily cut in clearing the land for cultivation."

It is seen from this that the settler has no right to dispose of the timber for any purpose not incident or reasonably necessary to the consummation of the object for which the land is allotted to him; he has no right to sell the timber for purposes of speculation or profit. After the expiration of five years from the date of original entry the settler, upon making certain proof as to ocupancy, cultivation and kindred matters, and filing an affidavit as provided by section 2291 of the revised statutes, "That no part of such land has been alienated," except for certain specified public purposes, is entitled to receive a patent which vests in him the title of the government.

The argument on the part of appellants is that the lease for turpentine purposes, under which appellee claims, is, in the meaning of section 2291, an "alienation" of a part of the land, and as this contract was made prior to the final divestiture of the title from the government that Hode could not have acquired the patent to the land without committing perjury and fraudulently concealing the fact that he had executed this conveyance. This argument is based upon an extention of the principle announced in *Anderson* v. *Carkins,* 135 U. S. L. Ed., 272. That was a case where a settler, prior to the issuance of final certificate, entered into a contract obligating himself to convey a portion of the land when the title should be finally acquired from the government, and it was there decided that a court of equity would not enforce specific performance of a contract which necessitated for its fulfillment the commission

of perjury by the settler, and which was evidently designed to thwart the public policy of the government in reference to homestead entries. The contract sought to be enforced in that case was flagrantly violative of the distinctly expressed policy of the government forbidding alienation of any part of the land granted the homesteader.

In order to ascertain whether the instrument under which appellee claims was in violation of the statute forbidding alienation we must first ascertain the meaning of the word "alienation," as used in this connection, and in passing to this consideration should bear in mind that all provisions of law in restraint of alienation are to be strictly construed.

"Without entering upon an extended discussion of the subject, it is sufficient to say that the law does not favor restraints upon alienation, and nothing short of a positive provision to that effect will justify the court in holding that a statute imposes such restraints." *Knight* v. *Leary,* 54 Wis., 469.

The provision as to alienation in section 2291 is *"that no part of such land has been alienated except as provided in section 2288."* Turning to section 2288 we find that the alienation therein permitted is of a definite quantity of the land itself—not a lease of the land, not an interest in the timber, not a lien on the land, but "a part of the land." It has been repeatedly held that a mortgage or other lien on the land does not come within a prohibition against an alienation, the reason being that while the lien may finally result in an alienation, it is not in itself a violation of the limitation placed upon the right of the owner.

"Alienation is the voluntary and complete transfer from one person to another, and, if it be concerning the transfer of property, it involves the complete and absolute exclusion, out of him who alienates, of any remaining interest, or particle of interest, in the thing transmitted. It involves the complete

transfer of the property and possession of land, tenements, or other things to another." *Stark* v. *Duvall*, 7 Okla., 217.

"The alienation prohibited by the statute is an absolute alienation of the land, or a part thereof." *Mudgett* v. *R. R. Co.*, 8 Land. Dec. Dept. Int., 243; *Wilcox* v. *John*, 40 Pac., 880; *Dickenson* v. *Bridges*, 147 Mo., 235; *Weber* v. *Laidler*, 26 Wash., 144; *Meinholdt* v. *Walters*, 102 Wis., 289; *Hot Springs R. R. Co.* v. *Tyler*, 36 Ark., 205; *Full* v. *Hunt*, 48 Iowa, 166.

*United States* v. *Fryberg*, 32 Fed. Rep., 195, and *Teller* v. *United States*, 117 Fed. Rep., 577, are cases in which the statement of facts discloses that prior to the issuance of a patent to the land, and before final proof of residence and cultivation, the settler in possession under his incomplete title had sold for profit a large part of the merchantable timber on his entry, and suits for the value of the timber had been instituted by the government and were then pending, yet notwithstanding the existence of these facts was known to the proper department, the settler was permitted to perfect his title to his homestead and the patent, when issued, was held to relate back to the time of the original entry and to protect the settler and his vendee against civil suit for damages. *United States* v. *Ball*, 31 Fed. Rep., 667.

And in the Teller case, *supra*, the following significant language is used: "Defendant's purchase of the timber from Mulison (the settler), and payment for it to enable Mulison to perform his contract with the government and to obtain title to the land was lawful and unobjectionable had he allowed the timber to stand until Mulison had so obtained title."

And yet if the sale of the timber was an "alienation" condemned by law, as contended by appellants, not only would it *not* have been lawful and unobjectionable, but would have precluded the settler from receiving a patent to the land. *Ratfield* v. *McKay*, Copp's Public Land Laws Decisions, 256.

From these considerations we are led to the conclusion that a sale of the standing timber by a settler prior to the issuance of his final certificate, while in direct violation of the rights vested in him by his incohoate entry, is still not an "alienation" of a part of the land within the purview of setcion 2291, and that a settler who, having without warrant or legal right, sold standing timber on his homestead allotment, still makes the affidavit required by that section in order to perfect his title, does not thereby commit perjury. The conclusion above announced is decisive of the first proposition relied upon by appellants, even when stated most strongly in their favor.

If an absolute sale of the standing timber is not such an act as will prevent the issuance of patent, it inevitably follows that grant of a lease of short duration and for a specific use, not contemplating either the cutting or destruction of the timber, will not have such effect. For it has been expressly decided that the granting of and operating under a lease for turpentine purposes, such as the one here considered, was not a sale of the timber, was not violative of any statute pertaining to the public domain allotted as homestead entries, and did not render the parties operating thereunder amendable to the criminal laws devised to protect timber on public lands from depredation and destruction. *Leatherbury* v. *United States,* 32 Fed. Rep., 780.

And in a recent case, after full consideration, the court says: "It is conceded that the purpose of the act in question is to protect the public lands. Taking a comprehensive view of the various provisions to which we have alluded, and bearing in mind the definitions we have suggested as applicable to the terms used in the statute, the legislative intent seems to have been to secure that protection by preventing the unauthorized cutting down, removal, or destroying of the timber trees growing thereon, and the unauthorized removing and destroying of such timber trees as have been already felled or cut down, or

as might be felled or cut down from time to time; and it is not at all apparent to us that it was the intent of the legislature to make the 'cutting and boxing of pine trees on public lands of the United States for turpentine purposes' a criminal offense. We think it not a matter of common knowledge that such cutting and boxing of pine trees destroy the value of the trees as timber, or that it has a tendency even to retard the growth of the trees. It is, however, we think, a matter of common knowledge, of which we may take notice, that on March 2, 1831, and long before that date, the 'turpentine business' was an industry most prevalent in all the parts of the country where there were pine trees growing on public lands, and, if it had been the intention to protect these public lands from the ravages of that business, it would have been easy to make that intention clear by the use of appropriate words." *Bryant v. United States,* 105 Fed. Rep., 943.

From this broad field of research we glean the following general principles as defining the rights of the homestead settler after preliminary certificates of entry and before final proof is made:

1. To occupy the land, to protect it from trespass by others, and to use it for all purposes incidental to its cultivation, and with the view of complying with the obligations imposed by the grant.

2. To cut and remove therefrom the timber only when necessary for the improvement of the land and in the ordinary preparation of his "farm for tillage."

3. He has no right to fell timber or permit it to be done by his vendee for the purposes purely of speculation or profit. Such act is prohibited and would render him and his vendee liable to prosecution, both civil and criminal, but does not constitute an alienation of a "part of the land" and presents no legal obstacle to the issuance of a patent upon proper final proof.

4. A lease of timber for turpentine purposes is not forbidden by any express statutory provision.

Assuming these deductions to be logically sound, and making an application to the facts of the concrete case presented by this record, it becomes apparent that Hode violated no law in making the lease under which appellee claims, and, consequently, such contract was not void as being in derogation of a statute. This disposes of the first contention of appellants.

The remaining contention of appellants is that conceding that the granting of a turpentine lease does not contravene the express provision of the statute prohibiting the cutting of sanding timber and restraining the alienation of any part of the land comprised in the homestead allotment, nevertheless specific performance of the contract under which appellee claims will not be by a court of conscience decreed because the contract, if not inherently illegal, is still in violation of the public policy of the United States government in dealing with its homestead lands, and the case of *Anderson v. Carkins, supra,* is also relied upon in support of this position. But in *St. L. M. & Co. v. Montana Mining Co.,* 171 U. S. R., 43, L. Ed., 322, the case involving the legality of a bond for title entered into before issuance of patent to a part of the land embraced in a mining claim, and where the chief, if not the sole, contention was "that the bond was given contrary to equity, good conscience, and public policy," the court, speaking through Justice Miller, says: "The supreme court of Montana ruled that in the absence of statutory prohibition there was no reason in law or equity, where the contract sought to be enforced, should be held illegal, and we concur in this disposition of the federal question suggested. The public policy of the government is to be found in the constitution and laws, and the course of administration and decision."

And the validity of the contract was upheld and enforced as not contravening any statute or any "fundamental principle of law recognized as the basis of public policy."

The court further states that the case of *Anderson* v. *Carkins, supra,* "was disposed of on different grounds," and that case is considered and distinguished by showing that the contract there under review was condemned because its consummation contemplated perjury on the part of the settler.

Again, in *United States* v. *Trans-Missouri Freight Ass'n.,* 166 U. S., 340, it is said: "The public policy of the government is to be found in its statutes, and when they are not distinctly spoken, then in the decisions of the courts and the constant practice of the government officials, but when the lawmaking power speaks upon a particular subject, over which it has constitutional power to legislate, public policy in such a case is what the statute enacts."

The inference clearly to be drawn from the cases last cited and the authorities on which they are based, is this, that contracts are not in violation of the public policy of the government unless either prohibited by express terms or the fair implication of a statute, or condemned by some decision of the courts construing the subject-matter. In the instant case the contract sought to be enforced is not violative of any statute, and, so far as we have been able to ascertain, has never been condemned by the decisions of any federal court nor by the ruling of any department or official of the government, and does not of itself thwart the policy of the government which is to "secure for the homesteader the exclusive benefit of his homestead right." The only authority to the contrary directly in point is *Milliken* v. *Carmichael,* 33 So. Rep., 9, whereupon identical facts the supreme court of Alabama arrives at the opposite conclusion. The reasoning of the court is not given, but apparently the decision, declaring the lease to be a contract to convey an interest in the land, and consequently void and nonenforceable because prohibited on grounds of public policy, is based upon what to us appears to be an unwarranted extention of the reasoning in *Anderson* v. *Carkins, supra.* But

that case, as hereinbefore pointed out, dealt not with a lease for a short term of the use of timber, but with an alienation and conveyance of a part of the land itself, a contract which could only be effectuated by the commission of deliberate fraud and perjury. In our judgment the cases are not parallel.

Finally, in this connection, it is urged that specific performance of the prior lease contract made by Hode cannot be decreed, and that he is not estopped by his conduct in making that contract from making a subsequent one. This fallacious argument is based upon an attempted application of the well-recognized principle of law that one cannot be held to be estopped from doing what he has the right to do by proof that he had previously committed an act or entered into a contract which was forbidden by law, and that a court of equity will not enforce a contract which is illegal or contrary to public policy. The abstract accuracy of this proposition of law may be conceded, but its application to the case at bar is strained and farfetched. Hode had a right to contract with the assignor of appellee for the turpentine lease, whether that lease was to begin at once or not until after his homestead entry was perfected. Whether enforceable while the homestead entry was still incomplete we are not called on now to say, but when the patent was issued divesting the title from the government and vesting it in Hode, this related back to the date of the original entry, not only for the benefit of the settler himself, but it also inured to the benefit of those with whom he had dealt, whether lienors or lessees, and validated all contracts previously entered into which were not expressly violative of the statutes of the United States. *United States* v. *Fryberg, supra; Teller* v. *United States, supra; Heath* v. *Ross,* 12 Johns, 140.

We have not in this case chosen to rely upon the previous decisions of our court in which this principle has been impliedly recognized.

The exact point here decided was not there presented or ar-

gued, but after careful review of all the authorities cited, in which a painstaking research has been brought to our notice, we are confirmed in our view as to the correctness anl soundness of the principles heretofore announced and hereby reaffirmed. *Hartman* v. *Butterffield Lumber Co.,* 82 Miss., 494; s. c., 34 So. Rep., 328; *Anderson* v. *Wilder,* ante, 606; s. c., 35 So. Rep., 875; *Sandford* v. *Eslabulchie Lumber Co.,* ante 478; s. c., 36 So. Rep., 10.

The fact that in those cases the proceeds of the timber were applied to the improvement of the land, or the payment to the government of the purchase money, does not, as contended by appellants, distinguish them from the case at bar. *United States* v. *Murphy,* 32 Fed. Rep., 383; *Teller* v. *United States,* 113 Fed. Rep., 273.

The general principles of law herein announced support and strengthen the conclusions there reached.

The true rule is that all contracts in reference to homestead allotments, not in violation of express statute or fundamental principles of public policy, though made prior to grant of patent, may, after the title is invested from the government, be enforced, and are within the "efficacious reach of the doctrine of estoppel."

We hold, therefore, that the lease for turpentine purposes entered into by and between Hode and appellee's assignor, is valid and enforceable, and that the doctrine of estoppel applies and protects appellee in the full and undisturbed enjoyment of its rights thereunder.

In view of the importance of the question, the earnest arguments of counsel, and the statement that this was a test case, submitted so that the opinion herein might serve as a guide in the decision of numerous others, we have based this opinion upon the general principles of law applicable to all similar cases. In the instant case the correctness of the conclusion is affirmed and assured by the consideration that the lease in

question was only for a term of three years after the boxes were cut, and contained no stipulation, and the pleadings contain no affirmative allegation that the use of the timber under the lease was to begin before the final perfecting of the title, or that in fact any timber was boxed or cut until after title was divested from the government. While these considerations are absolutely decisive of the questions presented by this record, we prefer to base our decision upon the general propositions hereinbefore announced.

*From the foregoing considerations it follows that the action of the chancellor in refusing to dissolve the injunction was correct and is affirmed, and the case remanded for further proceedings in accordance herewith.*