# CASES ARGUED AND DETERMINED

## IN THE

# SUPREME COURT OF MISSISSIPPI

### AT THE

## MARCH TERM, 1911.

CUMBERLAND TELEPHONE & TELEGRAPH CO. *v.* STATE EX REL. ATTORNEY-GENERAL.

[54 South. 670.]

1. MONOPOLIES. *Statutes. Construction. Code* 1906, *sections* 5005 *and* 5002. *Laws* 1908, *chapter* 119. *Laws of* 1910, *chapter* 223.

Code 1906, section 5005, as amended by Laws 1910, chapter 223, prohibiting one competing corporation from purchasing the capital stock of another competing corporation, etc., does not apply to a contract when one of the parties is an individual and the other a corporation and there is no law in this state which prevents either, from in good faith buying out the other.

2. MONOPOLIES. *Code* 1906, *section* 5002. *Laws* 1908, *chapter* 119.

In determining whether a contract is violative of Code of 1906, section 5002, as amended by Laws 1908, chapter 119, defining a trust, as a combination in restraint of trade the court must consider the contract, in the light of the facts explanatory thereof, since the questions involved are questions of both law and facts.

(102)

3. Monopolies. *Trust.  Restraint of trade.  Code* 1906, *section* 5002.
   *Laws* 1908, *chapter* 119.

    Code of 1906, section 5002, as amended by Laws 1908, chapter 119,
defining a trust as a combination in restraint of trade or to
monopolize the production, control, or sale of any commodity,
or the prosecution or control of any business, etc., includes
within its provisions those contracts in restraint of trade, those
monopolies and attempts to monopolize that were invalid as
against public policy before the enactment of this statute, which
simply broadens the penalties and extends the right to attack
such combinations.

4. Same.

    Contracts in reasonable restraint of trade were valid before the
enactment of this anti-trust statute, where its design and pur-
pose is not to create a monopoly, and such contracts are valid
now, where they are such only as to afford a fair protection
to the interest of the party in favor of whom it is given, and not
so large as to interfere with the interest of the public.

5. Same.

    As to what does or does not constitute a monopoly within the
meaning of the statute the courts must be left to determine
when the question arises.  The question is of necessity one of
mixed law and fact.

6. Monopolies. *Code* 1906, *section* 5002.  *Laws* 1908, *chapter* 119.

    A contract between a long distance telephone company owning
a long distance line through a county, but doing no local busi-
ness therein, and an individual operating a local system therein,
which provides for connection between the two systems and
which forbade the individual from extending his lines so as to
conflict with the business of the company during the life of the
contract, and from making any connection with any other tele-
phone line and to give its long distance business exclusively to
the company, is not in the absence of proof showing that it was
designed for the purpose of stifling competition or creating a
monopoly, violative of Code 1906, section 5002, as amended by
Laws 1908, chapter 119, prohibiting contracts in restraint of
trade.

Appeal from the chancery court of Marshall county.
Hon. I. T. Blount, Chancellor.

Suit by the state on the relation of the attorney-general against the Cumberland Telephone & Telegraph Company. From a judgment for plaintiff defendant appeals.

The facts are fully stated in the opinion of the court.

*J. B. Harris,* for appellant.

*W. V. Sullivan* and *S. S. Hudson,* attorney-general, for appellee.

The record in this case has been lost and the briefs of counsel for this reason are not given.

MAYES, C. J., delivered the opinion of the court.

The proceeding in this case is brought by the attorney-general under chapter 145, section 5002, Code of 1906, as amended by Laws of 1908, page 124. This suit was instituted on the 28th day of September, 1909, against the Cumberland Telephone & Telegraph Company for an alleged violation of the anti-trust laws, and the purpose of the suit is to recover the penalties imposed by section 5004. The trial court rendered a judgment in favor of the state for the sum of one hundred sixteen thousand and four hundred dollars, holding that the contract which we shall set out in full a little later constituted a violation of the anti-trust laws, from which judgment this appeal is prosecuted. The minimum penalty allowed to be imposed under the statute is two hundred dollars per day, and the minimum penalty was imposed by the trial judge, the time being fixed from the date of making the contract, which will hereafter be stated, to the date of filing of the bill as above specified and making five hundred and eighty-two days. The contract was made by the Cumberland Telephone & Telegraph Company on the 24th day of February, 1908, with the Oxford telephone system. The Cumberland Company is a corporation, but the Oxford system is unincorporated.

No testimony was taken, but the case was heard on the bill, answer, and exhibits, and the facts shown by same are substantially as follows:   In the year 1901 W. H. Harvey owned and operated a purely local telephone system at Oxford, Lafayette county, Mississippi, and had no long-distance facilities or connections.   The Cumberland Telephone & Telegraph Company at that time was not doing business in Oxford, or in Lafayette county, but had a long-distance line extending through the country into many other portions of the state and into many other states.   Harvey desired to obtain for his subscribers the advantage of a connection with a long-distance line, and, with this object in view, solicited the Cumberland Company to allow a connection to be made between its long-distance lines and his local system.   The arrangement desired by the local system was finally arranged between the two on certain terms and conditions expressed in a written contract made between them on the 23d day of November, 1901.   The contract of 1901 is not important in this case, so its terms will not be set out.   Suffice it to say that the systems continued to operate under the above contract as long as Harvey owned the local system and until some time in 1903, when L. F. Tool and W. J. Clark purchased the local system from Harvey, and, after the purchase, they continued to operate the system under the same contract made by Harvey with the Cumberland Company until the 24th day of February, 1908, when the Cumberland Company and the then owners of the local system made a new contract. Since this last contract is the one which it is claimed violated the anti-trust statutes of the state, we set out all of the contract involved.

It is as follows, viz.:

"Whereas, the second party (the Oxford Telephone Company) is the successor to the rights and privileges created or established by reason of a certain contract entered into on the 23d day of April, 1901, by and be-

tween the first party and W. H. Harvey, of Oxford, Mississippi, and under which contract the first party furnished to said Harvey certain telephone apparatus, which apparatus was turned over to the second party, and the first party has, since the transfer of said apparatus by Harvey to second party, furnished second party certain telephonic apparatus; and

"Whereas, the first and second parties desire to enter into a new contract to cover connection between the telephone exchange system of second party in Oxford, Mississippi, and the systems of the first party:

"Now, therefore, in consideration of one ($1.00) dollar each to the other in hand paid, the receipt of which is hereby acknowledged, the parties hereto mutually covenant and agree as follows:

"(1) Except as to amounts due from one party to the other under the aforesaid contract of date November 23d, 1901, and except as to the responsibility of second party to first party for telephone apparatus furnished it, the said contract of date November 23d, 1901, shall be and the same is hereby superseded by this contract.

"(2) The second party agrees to ship to the first party at Nashville, Tennessee, freight prepaid, the switchboard furnished first party under the aforesaid contract of November 23d, 1901, within ninety days from the date hereof, and to pay for the use of said switchboard at the rate provided in said contract until the same shall have been shipped to first party as aforesaid.

"(3) The first party agrees to furnish at its Memphis, Tenn., office to the second party the standard form of transmitter and the receiver used by it, at the rate of one dollar per annum, payable in advance for each set of instruments, consisting of one bi-polar receiver and one solid back transmitter, furnished; and second party agrees to pay for the use of such transmitters and receivers heretofore or hereafter furnished at said rate

per annum at the office of first party, in Nashville, Tenn., from date of this contract, and second party shall pay for the use of equipment furnished prior to the date of this contract at the rate provided in the aforesaid contract, dated November 23d, 1901. Each and every instrument embraced in the system of the second party shall be equipped with transmitters and receivers furnished by first party, and shall be used only on the telephone embraced in the system of second party in Oxford, Mississippi, and vicinity. Second party agrees not to extend its lines in such manner as to conflict with the business or interest of the first party or its subscribers, and not to make any connection, directly or indirectly, with any other telephone lines, nor to extend its lines outside of Lafayette county, Mississippi, without the written consent of the first party. In the event transmitters and receivers furnished hereupon become defective and are returned to the first party at Memphis, Tennessee, freight prepaid, first party will repay or replace same without additional charge.

"(4) Oxford shall be in the future, as in the past, the connection point between the systems of the parties hereto, and the second party agrees to make such connection for direct communication between its subscribers and the system of the first party as it may be called upon to make, it being expressly agreed and understood that second party shall be responsible to the first party for all messages sent from stations embraced in its system to points on the long distance lines or connecting lines of the first party, and that the messages sent over the lines or connecting lines of first party shall be subject to the rules, rates, and regulations of the first party, and the second party shall receive a commission of fifteen per cent. on all moneys (except messenger fees) collected by it for messages sent from stations embraced in its system to points on the long-distance lines of the first party; but no commission will be allowed second

party on moneys collected by it for messages sent over the lines of any other company than first party.

"(5)   In the event the second party shall decide to cancel this contract before its expiration, or to dispose of its property, or the control of stock of its company, the first party shall, in the event second party shall decide to cancel the contract before its expiration, have the right to purchase the property of second party by arbitration, one arbitrator to be selected by each party, the two so chosen to select the third and fix the price, and each party shall be bound by the finding of such arbitrators; in the event the second party shall desire to sell the property or control of stock of the company, the first party shall have the refusal of such property or stock at the same price second party may be offered for the same.

"(6)   A diagram of the lines of the second party is hereto annexed and made a part hereof.

"(7)   Settlement for tolls shall be made monthly for the month next preceding.

"(8)   In case of any failure of payment or other violation of any of the terms of this agreement by the second party, continued for ten days after notice or demand by the first party, or in case the second party shall become bankrupt or insolvent, the first party may at its option immediately terminate this contract by written notice to the second party, or to those in charge of its principal offices.

"(9)   This contract shall become effective and be in force for five years from date hereof, and thereafter until thirty days' written notice of intention to terminate the same be given by either party to the other."

The bill of complaint makes the contract on the 24th day of February, 1908, fully set out above, an exhibit to same, and asserts that its purpose and effect was to shut out competition, and to monopolize and control the prosecution and management of the telephone business.   The bill

concluded with a prayer for the recovery of the penalties provided for in section 5004 of the Code of 1906, and also prayed for an injunction to restrain the further continuance of the contract. The Cumberland Company filed a lengthy answer to the above suit. We shall not undertake to give it in full, but will state only the material parts of same. It is stated in the answer that neither at the date of the contract nor at any time since then has the Cumberland Telephone Company been engaged in a local telephone business in Oxford or in the county of Lafayette, nor has the Oxford system then, now, or at any other time engaged in the long-distance business, nor was it facilitated for same or contemplating engaging in the long-distance business; that the Oxford system was in no sense a competitor, for the two companies were not seeking to do the same character of telephone business; that numerous contracts of this character are made, but the contracts are not made for the purpose of suppressing competition, or for the purpose of monopolizing, or attempting to monopolize, the control or management of the telephone business in the communities where made, but for the purpose of extending the telephone business, and giving communities telephone service and facilities which they could not otherwise obtain; that the provisions in the contract in reference to extending the lines of the local systems and making connections with other lines are solely for the purpose of protecting the Cumberland Company against such extensions and connections as would be ruinous to its business, and prevent its efficient service to its numerous patrons; that the contracts simply provide that the extensions and connections made by a local connecting line must be with the written consent of it, the licensor, in order that the facilities furnished the local company by the Cumberland Company shall not be used in a manner detrimental to its interests, and that of its numerous subscribers. In other words, the answer states that it is necessary for

the proper conduct of its telephone business, and the proper service of its numerous subscribers and the proper discharge of its public duties, that the Cumberland long distance should have some supervision in the connections and extensions which are made by the local companies with which it contracts, and to which it furnishes apparatus and equipment, which otherwise might prove ruinous to the business and very detrimental to the public service. If no restrictions were placed upon extensions and connections, its lines might in a short time become connected with and used by other lines, over which it had no sort of control, and which are actual competitors, and which would greatly interfere with the Cumberland Company's business.

In short, the answer states that these contracts are made with non-competing local telephone systems; the object of the contract being to give the local telephone systems with which they are made, and which are not in competition with the Cumberland system, all the advantage offered by the long-distance system of the Cumberland Company. In doing this and yielding its long-distance system to the patrons of the local phone system, the Cumberland claims the right to protect itself from abuse by requiring the local connecting system to use certain standard transmitters and receivers, and to patronize the Cumberland system alone in sending long-distance messages, and not to extend its lines so as to be detrimental to the interest of the Cumberland Company so long as the contract lasts, unless the local system obtains permission of the Cumberland. The facts further show, according to the answer, that there has not in fact been any monopoly or suppression of competition, because no competition ever existed or was in contemplation, nor does the bill allege that competition was desired or intended. It is alleged in the answer that the sole purpose of this contract is to protect the Cumberland Company in the use of its property, and that the restric-

tions placed on the contracts are for the legitimate, regular, and normal prosecution of the Cumberland's business. It is further shown that the Cumberland gives the same facilities to all local systems desiring them, reserving the right to make them exclusive when more than one local system is in operation at the same place, and that a copy of the contract is on file with the railroad commission of the state, and has been on file for many years; that the desire of local systems to take advantage of the facilities for long-distance arrangements offered by the Cumberland exceeds the ability of the Cumberland to furnish; and that these connections thus allowed greatly benefit the public.

In deciding this case, the distinguished chancellor places in the record a written opinion. The reason assigned by him for holding this contract in violation of the antitrust statutes is put in the following language: "This case was submitted on bill, answer, and exhibits, without proof. Counsel for defendant urges that, the cause being thus submitted, the state is precluded from recovery on all allegations in the bill of complaint to which the answer is responsive. This is correct as to everything specifically denied, but the defendant in its answer admits entering into the contract, the illegality of which is the crux of this case. The real question then is: Was the contract violative of the anti-trust law?" We set out the above quotation for the purpose of showing that the court below shut out all explanations made by the answer, aand considered the case on the contract alone, holding that the contract on its face violated the anti-trust laws of the state, because it so far controlled the Oxford Company as to require it to send "all long-distance messages over the Cumberland's line," and because it "prohibited the Oxford Company from making any connection with other telephone companies, or extending its lines, so as to conflict with the business or interests of the Cumberland Company, without the writ-

ten consent of the latter company," during the existence of the contract. While the trial court held that the contract was a violation of the anti-trust laws and imposed a penalty on appellant on account of same, the court refused to enjoin the continued operation under the contract.

As only one of the contracting parties was a corporation and the other was an individual, section 5005, Code of 1906, as amended by the Laws of 1910, page 222, which prohibits one competing corporation from buying out the stock of another competing corporation, has no application, and there was, therefore, no law of this state which prevented either system from in good faith buying out the other; yet no law could compel either to allow a connection by the other. Under the contract, the local system became fully equipped as a local and a long-distance system, while the long-distance system interfered in no way with the local business of the local system, but received a small rental for transmitters and receivers furnished under the contract, and additionally obtained its subscribers as possible patrons of its long-distance facilities. In considering this contract, it must be considered in the light of the facts set up in the answer as explanatory thereof, since the questions here involved are questions of both law and fact. But, if this were not true, and we should consider this case on the contract alone without the explanations made by the answer, this contract standing by itself would constitute no violation of the anti-trust laws of the state, as we think will appear in the reasoning of the court a little later on in this opinion. The anti-trust laws of the state and the United States have been so frequently before the state and federal tribunals, and every phase and feature so ably and exhaustively discussed, that any attempt to improve on these discussions would be vain. One of the ablest discussions to be found in the books on this subject is the case of *Railway Co.* v. *Searles,* 85 Miss. 520,

37 South. 939, wherein Justice Truly rendered the opinion of the court. We shall have occasion to still further refer to this case later on, as well as many others on the same subject. In considering this case, a little review of the anti-trust laws may help us to better understand their application and purposes. Section 5002 of the Code of 1906, as amended by the Laws of 1908, page 124, makes unlawful as a trust and combine any "combination, contract, understanding, or agreement, expressed or implied, between two or more corporations, or firms, or associations of persons, or between one or more of either with one or more of the others," to accomplish many purposes specified in the act. In discussing this act we shall only set out those clauses which are involved in this litigation. The statute makes unlawful as a trust and combine any such contract, etc., (a) in restraint of trade; (k) or who shall monopolize, or attempt to monopolize, the production, control, or sale of any commodity, or the prosecution, management, or control of any kind, class, or description of business. If this contract is illegal, it falls under the inhibition of one or the other of the above clauses. When this statute was enacted, it introduced into the law no new definition of what constituted a "restraint of trade" or "a monopoly." It did not attempt to define either. These are questions to be determined in the light of the facts of each case and under the law relating to same as it stood before the statute was passed; otherwise there is no guide for the persons charged with the enforcement to be governed by. What does the statute mean when it prohibits contracts "in restraint of trade?" Does it mean that any contract which in any way restrains trade shall be illegal? If so broad a meaning should be given to the statute as this, it would involve a destruction and disaster to the commercial world never dreamed of by its authors, and not comprehended within the evil intended to be rectified. The statute only intended to include within its provisions

those contracts in restraint of trade, those monopolies, and attempts to monopolize that were invalid as against public policy before the enactment of the statute, and under such contracts in relation thereto could not be enforced as between the parties. A contract in reasonable restraint of trade was valid before the enactment of the statute, where its design and purpose is not to create a monopoly, and such contract is valid now ''where it is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public.'' *Edgar Lumber Co.* v. *Cornie Stave Co.* (Ark.), 130 S. W. 452; 3 Page on Contracts, p. 588; 27 Cyc. of Law 900, and notes; *Gibbs* v. *Consolidated Gas Co.*, 130 U. S. 396, 9 Sup. Ct. 553, 32 L. Ed. 979; *Oregon Nav. Co.* v. *Winsor,* 20 Wall. 64, 22 L. Ed. 315; *Cincinnati Packet Co.* v. *Bay,* 200 U. S. 179, 26 Sup. Ct. 208, 50 L. Ed. 428; *Merriman* v. *Cover, Drayton & Leonard,* 104 Va. 428, 51 S. E. 817.

While contracts in restraint of trade, monopoly contracts, and monopolies were held to be illegal under the law as it stood before the anti-trust statutes, such contracts could be avoided and injury done thereby rectified only by the parties themselves. While this was the case, the evil continued because those persons were frequently satisfied by the parties engaged in the prejudicial and unlawful enterprise, and the public at large left to suffer. In order to obviate these difficulties, anti-trust laws have been enacted enabling the state in its sovereign capacity to sue for and recover penalties in all such cases; in addition to this, giving any member of the public suffering injury or damage the right to sue also. In other words, the law as to what it now takes to make a contract in restraint of trade to monopolize or attempt to monopolize any business remains the same, but the parties who may sue and the penalties have been broadened. As to what does or does not constitute a monopoly within the meaning of the statute

is not always easy to decide. The courts must be
left to determine these questions when they arise. The
question is one of mixed law and fact of necessity. To
illustrate, suppose there are only two grocery stores in
a town. Suppose the business of the town is so small
as that a continuance of the two means a ruination of
both. May not the one sell out to the other for the pro-
tection of both? This same illustration might be used
in a countless number of instances. It is plain to be
seen that it will not do to so construe the statutes as that
one person may not sell to another when the very busi-
ness life of the seller depends upon it. Yet there may
be a character of business where these same acts would
be held to be unlawful. But our own court has expressed
the thought in the case of *Railroad* v. *Searles,* 85 Miss.
520, in part of opinion to be found on page 529 (37 South.
939, 942), in such apt phraseology that we here quote it,
viz.: "An analytical study of this section demonstrates
that it was the legislative design to prohibit and pro-
vide punishment for the formation of any criminal con-
spiracy by which the interest of the public might be in
any manner injured or jeopardized, whether such com-
bination was intended to be in restraint of trade, to limit,
reduce, or increase the price or the production of any
commodity, or to hinder competition in the importation,
manufacture, transportation, sale, or purchase of any
commodity, or to do certain other enumerated acts, which
would, in the judgment of the legislature, prove prejudi-
cial to the interest of the public or any part thereof, or of
any individual. . . . The design of the legislature was
to protect the public, not to unlawfully restrict the trans-
acting of business by either corporations or individuals.
The various kinds of legitimate business rendered neces-
sary by the multiform demands of public convenience,
the manifold callings which are an incident of this pro-
gressive age, all demand that the individual right of
contract shall be given full sway, conditioned only that

the rights of the public and the welfare of the people and the public policy of the state shall be held sacred. Says Terral, J., in *Houck* v. *Wright,* 77 Miss. 483, 27 South. 617; 'The legislature, by the chapter on trust and combines, did not intend to debar a person from conducting his own private business according to his own judgment.' . . . 'It was not the purpose of the convention or the legislature to limit either the term used in the Constitution or in the statute by any narrow definition, but leave it to the courts to look beneath the surface, and, from the methods employed in the conduct of his business, to determine whether the association or combination in question, no matter what its particular form should ·chance to be or what might be its constituent elements, is taking advantage of the public in an unlawful way. *Harding* v. *Am. Glucose Co.,* 182 Ill. 551, 55 N. E. 577, 64 L. R. A. 738, 74 Am. St. Rep. 189. In each case, therefore, under these provisions, the nature of the arrangement or combination is a question of fact to be determined by the court from the evidence before it or from the vice which inheres in the contract itself.' *MacGinniss* v. *Boston & M. Consol. Copper & Silver Min. Co.,* 29 Mont. 428, 75 Pac. 94; *Ceballos* v. *Munson S. S. Line,* 93 App. Div. 595, 87 N. Y. Supp. 811, and cases cited. Nor is the rule of construction different when applied to the federal anti-trust statute. . . . 'This act of congress must have a reasonable construction. It was not its purpose to prohibit or to render illegal the ordinary contracts or combinations of manufacturers, merchants, and traders, or the usual devices to which they resort to promote the success of their business, to enhance their trade, and to make their occupations gainful, so long as those combinations and devices do not necessarily have a direct and substantial effect to restrict competition in commerce among the states.' *Phillips* v. *Iola Portland Cement Co.,* 125 Fed. 594, 61 C. C. A. 19.'' Again the court says on page 528 of 85 Miss., page 942 of 37 South.:

"Section 198, Constitution 1890, commands the legislature to 'enact laws to prevent all trusts, combinations, contracts, and agreements inimical to the public welfare.' It must be observed at the outset that not all trusts, combinations, contracts, and agreements were to be prohibited because the great lawmakers who framed the fundamental law of this commonwealth as the same is embodied in our present Constitution well knew that such legislation would be palpably trenching upon, if not absolutely violative of, the inherent rights of the citizen, and would be restrictive to an unwarranted degree of the privilege of contract which every man is entitled to enjoy under our form of government. Tiedeman, Lim. Police Powers, section 244. No such legislation was authorized, because no such legislation was demanded. Only such trusts, combinations, contracts, and agreements were to be prevented as would be 'inimical to the public welfare.'"

We have quoted largely from the opinion in the Searles case, because the rule laid down in that case is narrow enough to exclude from its scope unlawful contracts and agreements, combinations, and monopolies in their true sense, and yet broad enough to leave life in all legitimate undertakings and enterprises. If the anti-trust laws are given a scope sufficient to throttle and choke out lawful business transactions, its effect upon the public would be as detrimental as the evils which it is designed to break up. Under the law as it stood before the enactment of the anti-trust statutes, courts were astute enough to discover these unlawful enterprises and apply such correction as the law then gave power to apply. As the law now stands, differing only in the fact that some new causes of illegality have been added for the avoidance of these unlawful agreements and combinations, penalties made more severe, and the parties who may sue made more numerous, the courts may still be relied upon to discover and punish in all proper cases.

The contract in this case is simply this: The Cumberland Telephone & Telegraph Company had a long distance line passing through Oxford, and Lafayette county. It was not doing any business of any kind in the town or in the country. The Oxford telephone system wanted to obtain for its patrons and itself the advantage of long-distance connections. The Oxford system proposed to the Cumberland to let it connect, and in consideration of this connection agreed to take certain improved transmitters and receivers and to pay a small rent therefor, further agreeing that so long as it retained this connection under the contract, it "would not extend its lines so as to conflict with the business or interests of the Cumberland Company, and would not make any connection with any other telephone lines; and would not extend its lines outside of Lafayette county, and would give its long-distance business exclusively to the Cumberland." What was unlawful about this agreement? What is unreasonable about it in the absence of proof showing that it was designed for the purpose of stifling competition or creating a monopoly? These two companies were not competitors. This contract bears every mark of a contract entered into in good faith and only for the purpose of affording a fair protection to the interests of the party in whose favor it was made, and not so wide in its scope and operation as to interfere with the interests of the public. If the Cumberland could not thus protect itself, the Oxford system having obtained the right to connect might have connected itself with other systems, and by its contract and through its exchange have connected all the systems around there with the long-distance lines of the Cumberland, thus using the Cumberland's line not only for itself, but for other companies. The contract promoted the efficiency of both systems, and made both of greater use to the public as well as more valuable to the owners. If the contention that this contract is illegal is to prevail, the court must hold that while either of

these systems could lawfully purchase the other, and stip-
ulate that the selling system would not engage in business
for a reasonable period of time and within a territory
reasonably necessary for the protection of the purchas-
ing company, yet when they do the lesser thing of only
buying and selling the right to use the long distance in
connection with the local business, leaving both systems
to manage and control their business without interfer-
ence by the other, the lesser contract is illegal. We shall
not undertake in this case to lay down any fixed rule by
which it may be determined in all cases what constitutes
a monopoly. This question must be left to the facts of
each case, but the fact must exist before the penalties
can be imposed. A profitable case upon this subject is
the case of *State* v. *Duluth Board of Trade,* 107 Minn.
506, 121 N. W. 395, 23 L. R. A. (N. S.) 1260. In the
authorities cited in this case will be found nearly every
decision in the United States, both state and federal, on
the subject involved in this case. In that case it is per-
tinently said: ''It does not follow that every contract
or combination which in any degree tends to restrict com-
petition is illegal. So strict a rule would invalidate in-
numerable ordinary business transactions, which are un-
objectionable and necessary that business shall not com-
pletely stagnate. As said in *Hopkins* v. *U. S.,* 171 U. S.
593, 19 Sup. Ct. 40, 43 L. Ed. 290: 'The contract con-
demned by the statute is one whose direct and immediate
effect is a restraint of commerce. . . . The acts . . .
must have a reasonable construction, or else there would
be scarcely an agreement or contract among business
men that could not be said to have, indirectly or re-
motely, some bearing upon interstate commerce or to
restrain it.' The anti-trust statutes were never designed
to forbid such transactions, and it has been universally
held that contracts and combinations which tend to pro-
mote business, and which only remotely, incidentally, and
indirectly restrain competition, are not forbidden. If

the necessary effect of the combination is to stifle or to directly or necessarily restrict free competition, it is under the ban of the law, whatever may have been the intention of the parties. But if 'it promotes and but remotely and incidentally restricts competition, while its main and chief effects are to foster the trade and increase the business of those who make and operate it, then it is not a contract, combination, or conspiracy in restraint of trade within the true interpretation of this act, and it is not subject to its denunciation.' "

The contract on the part of the Oxford system to give its long-distance messages to the Cumberland exclusively for the period of the contract was not in violation of the law. It was based upon a valuable consideration to both systems, and was not inimical to the public interest in any way. This character of contract is sustained by numerous authorities cited in brief of counsel for appellant. *Central Trans. Co.* v. *Pullman,* 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55; *St. Louis Drayage Co.* v. *L. & N. R. R. Co.* (C. C.), 65 Fed. 39; *Oregon Short Line* v. *Nor. Pac. R. R. Co.* (C. C.), 51 Fed. 465; *U. S.* v. *Addison Pipe & Steel Co.,* 85 Fed. 271, 29 C. C. A. 141, 46 L. R. A. 134; *L. & N. R. R. Co.* v. *West Coast Stores Co.,* 198 U. S. 497, 25 Sup. Ct. 745, 49 L. Ed. 1135.

*Reversed and dismissed.*

Smith, J. (dissenting).

I am of the opinion that this contract, and the acts of the parties under it, constitute an attempt on the part of appellant to monopolize the long-distance telephone business in Oxford and its vicinity within the meaning of subsection "k," chapter 119, Laws of 1908.

I doubt the validity of this contract at common law; but conceding that it was valid at common law and conceding, as the fact is, that there was no competition between the parties to this contract at the time it was entered into, the result, in my judgment, must be the same.

The effect of this contract was to remove, or to put it in the power of appellant to remove, at least one of its possible competitors, the local telephone company, to prevent the local company from doing business with any one desiring to compete with appellant, and to practically prohibit all of the subscribers of the local company, as long as it operated the only exchange in the town of Oxford, from using the long-distance telephone facilities which might be offered to them by any possible competitor of appellant. That the monopoly may not have been complete does not negative the fact that appellant attempted to make it so. An attempt is simply an intent to do a thing, coupled with an act which falls short of the thing intended. That appellant may have had the right to purchase the exchange and equipments of the local company as to which I express no opinion is immaterial. By merely purchasing the exchange and equipments appellant would not thereby have deprived any one of the right to deal with other persons who might desire to compete with it. But had it gone further, and, after purchasing the exchange, required its subscribers to agree to use only its telephones, it would then have monopolized, or at least attempted to monopolize, the telephone business in that community. The mere furnishing of telephone facilities to a community does, not, of course, constitute an attempt to monopolize the telephone business, but such an attempt is committed when, in addition to furnishing telephone facilities, an attempt is made to prevent the citizens of a community by contract or otherwise from dealing with possible competitors of the persons furnishing such facilities.