STATE *ex rel.* KNOX, ATTY.-GEN., *v.* EDWARD HINES LUM-
BER CO. *et al.**

(Division A.   Feb. 13, 1928.)

[115  So.  598.   No.  25076.]

(1)

2

*Corpus Juris-Cyc. References: Contracts, 13CJ, p. 426, n. 36; Monopolies, 41CJ, p. 101, n. 35; p. 178, n. 33; Quo Warranto, 32Cyc, p. 1417, n. 39; Trusts, 39Cyc, p. 88, n. 87; p. 90, n. 97; Public policy of state as determined by constitution and statute, see 6 R. C. L. 710; 2 R. C. L. Supp. 188; 4 R. C. L. Supp. 436; 6 R. C. L. Supp. 407.

4

*F. H. Lotterhos* and *James W. Cassedy,* for appellant.

*H. C. Holden, W. L. Wallace, T. J. Wills* and *Wm. S. Bennett,* for appellees.

24.

Argued orally by *F. H. Lotterhos* and *James W. Cassedy,* for appellant, and *William F. Bennett,* for appellees.

Cook, J. The state of Mississippi, on relation of its attorney-general, instituted suit in the chancery court of the First district of Hinds county against the Edward Hines Lumber Company, the Wyatt Lumber Company, the Champion Lumber Company, the Wolf River Lumber Company, the Lumbermen's Mills Company, Edward Hines Yellow Pine Trustees, and Edward Hines, L. L. Barth, and C. F. Wiehe, individually, and as trustees under a certain declaration of trust, wherein they are styled "Edward Hines Yellow Pine Trustees," all alleged to be nonresidents of the state of Mississippi, and also eleven resident defendants who are named as garnishees. There were filed with the bill, as exhibits thereto, a certain deed of conveyance executed by the several corporate defendants to Edward Hines, L. L. Barth, and C. F. Wiehe, as trustees, and a certain declaration of trust executed by said trustees, both of which instruments were executed January 1, 1918.

The deed of conveyance which was filed as Exhibit A to the bill of complaint conveyed to said trustees all of the lands, timber, and timber rights, and all other real rights or interests in law or equity, owned by the grantors, in the counties of Harrison, Hancock, Stone, Lamar, Pearl River, Marion, and Walthall, in the state of Mississippi, together with all the improvements thereon, and all the appurtenances thereunto in any wise appertaining; and it set over, assigned, and conveyed to said trustees, as such, all timber or timber rights on any of said lands, or on account of any actionable entry upon or oc-

cupancy of lands or any part thereof, and assigned, transferred, and conveyed to said trustees, as such, all claims, demands, or rights of action arising out of any breach of warranty or other covenants or contracts respecting purchases by the grantors or conveyances to them.

The declaration of trust filed as Exhibit B to the bill of complaint refers to the deed of conveyance and recites that:

"Whereas, by proper bills of sale, assignments, indorsements, and transfers bearing even date therewith, there had also been transferred, assigned, set over, and conveyed to said Edward Hines, C. F. Wiehe, and L. L. Barth as trustees of Edward Hines Yellow Pine Trustees, certain personal property, including contracts for the sale of land, promissory notes, accounts, contracts, choses in action, and other like personal property, and that, whereas said deed, assignments, transfers, and conveyances had been so made to said trustees upon the trust thereupon specified, and in consideration of the making and execution of said declaration of trust:

"Now, therefore, we, the said Edward Hines, C. F. Wiehe, and L. L. Barth, and our successors, do hereby declare and agree as between ourselves and with all persons who now are in anywise, and who may hereafter become interested herein, and with all persons who may become owners of or in any way interested in any of the certificates of beneficial ownership or shares that may be issued hereunder, that we will, and our successors shall, hold, manage, administer, and dispose of all property, both real, personal, and mixed, so conveyed, assigned and transferred to us as such trustees, and all additions thereto and proceeds thereof, and all income and profits therefrom, and all property, both real, personal, and mixed, together with the proceeds thereof, and the income therefrom, that may hereafter be conveyed or delivered to us as such trustees, or to our successors

hereunder, or that may, through investment or reinvestment or in any other manner, come into our or their hands as such trustees, in trust for the following purposes and subject to the stipulations herein contained," etc.

The reasons for the organization of, and the objects and purposes to be accomplished by and through the declaration of trust, are stated in the following language:

"Section 1. The great bulk of the real property which has on this day been conveyed to said herein-named trustees, and the management, sale, and other disposition of which is herein provided for, is wild and uncultivated timber lands and timber rights. The same was acquired to cut the timber thereon and to operate sawmills, and generally to utilize all the forest products thereon, and thereupon to colonize or otherwise settle the same as rapidly as possible with farms or like developments. The greater portion of said lands and timber is located remote from transportation or other facilities, which renders same unavailable immediately for use, and all of same are being maintained at an enormous expense of taxes and carrying charges, which, unless said properties and the timber thereon are converted and disposed of or developed, will speedily absorb and destroy the value thereof. The general purposes of this trust are to dispose of or convert and liquidate into money, as rapidly as practicable, for the benefit of the certificate holders, the trust estate, either by sale or other disposition or by manufacturing or other utilization of the trust estate within such time as may in the judgment of the trustees reasonably exercised, be for the best interests of the certificate holders without sacrificing the value of said property. And to that end it is declared: That the trustees shall proceed as soon and as rapidly as practicable in the judgment of the trustees, reasonably exercised, to said disposition, conversion, and liquidation in the manner or manners deemed by them to be for the

best interests of the certificate holders; that the trustees shall not engage in any business not reasonably necessary or adapted to the said disposition, conversion, and liquidation; that the trustees shall not with the funds or property of the trust acquire other or further property except such as may be reasonably necessary or adapted to or convenient for the said disposition, conversion, and liquidation; that the trustees shall not loan the funds of the trust estate or indorse any negotiable paper or execute any guaranty or mortgage or pledge or hypothecate its property except (a) as may be reasonably necessary in said disposition, conversion, and liquidation of the trust estate, or (b) to or for the benefit of a corporation in which the first certificate holders herein named own at the date of this instrument a majority of the capital stock, and in that case only for the purpose of permitting such corporation to retire or renew its outstanding indebtedness, present or future, and only to an aggregate amount including all loans, indorsements, and guaranties to or for the benefit of such corporation, not exceeding two million five hundred thousand dollars, or (c) to or for the benefit of a corporation or corporations coming within the terms of the proviso to paragraph (10) of this section; that the trustees shall not accumulate or withhold from distribution profits or incomes of the trust estate, or withhold distribution of the proceeds of the *corpus* of the trust estate, for any greater length of time or to any greater extent than may be reasonably necessary to carry out the general purposes hereinbefore expressed and to pay or properly secure the payment of all of the debts of the trust estate and to comply or properly secure compliance with all of the contracts or other obligations of said trust estate. The powers of the trustees hereinafter set out are granted as appropriate means of accomplishing the general purposes hereinbefore expressed; and any and all express limitations on the powers of the trustees herein expressed shall be construed

as limiting any power in this declaration of trust set out: Provided, that any act or thing done by the trustees or other officers, managers, or agents under a resolution or other authority of the trustees shall as to strangers dealing with the trust in any way be conclusively deemed to be within the purposes of this trust and the powers of the trustees.''

In setting forth the duties, obligations, and powers of the trustees thereunder, the declaration of trust goes at great length into detail and states that, ''conformably with said situation and the purposes aforesaid, the trustees shall, except as otherwise in this instrument provided, have the full, absolute, and plenary power and discretion'' to exercise certain named powers, some of which may be summarized as follows:

(1) To engage in and carry on the business of manufacturing, or otherwise preparing for market, lumber and all other forest products, and all by-products thereof, either in finished or unfinished state, and of buying and selling the same at wholesale or retail, and to said ends, to acquire or construct or rebuild sawmills, planing mills, turpentine plants, reduction plants, paper mills, logging railroads, spur lines, river, lake, or seagoing equipment, and all such like or other property or equipment necessary or desirable to the ends aforesaid, and to operate all or any of the same.

(2) To develop, subdivide, and improve lands, urban or rural, and to sell, prepare to sell, and to contract to sell the same; to take all necessary steps to settle and put to use the lands belonging to the trust estate; to build roads, farm houses, or other improvements; to place lands in condition for cultivation, including clearing, fencing, and breaking; to conduct demonstration farms, agricultural and horticultural; but the trustees are prohibited from engaging in agriculture except for certain specified purposes.

(3) To engage in stock or cattle raising in all its branches, both for demonstration purposes and for profit,

and to set aside out of the trust estate, and acquire adjacent to it, such tracts of land as may be fitted or suitable for said purposes, and to acquire and place thereon stock and cattle of all kinds.

(4) To prospect, drill for, mine, and produce oil, gas, coal, and other minerals, and to refine, transport by pipeline, or otherwise, and to prepare for market, buy, and sell any and all of same.

(5) To contract for or acquire by purchase, lease, or otherwise, and hold and own any and all real estate, including not only the present trust estate, but real estate adjoining or reasonably adjacent to the same, necessary or convenient in any wise to be used in connection therewith or to better serve any of the purposes of the trust.

(6) To purchase any property, real or personal, which they are authorized to acquire and to sell or exchange any part of the trust estate, in any case either for cash or other considerations, or upon credit, or partly for cash or other consideration and partly upon credit.

(7) To borrow, and lend (subject to certain specified limitations) moneys in such amounts, for such time, and upon such terms as they may consider for the best interest of the trust estate, and to take or make, give, execute, and deliver bonds, promissory notes, or other evidences of indebtedness, with or without security, and accept or make, execute and deliver, deeds, conveyances, mortgages, or other instruments securing the payment or satisfaction of the same in whole or in part.

(8) To take any action of any kind and character that may be necessary or expedient or convenient to carry into effect the purpose of the declaration of trust, as specified therein, or in any amendment thereto duly adopted, and it is provided that every power and authority, adequate or necessary or proper or convenient to the ends and purposes therein mentioned, shall belong to said trustees and to them solely in their absolute dis-

cretion, and without let or hindrance by or from the holders of the certificates or shares therein mentioned or any of them, or any party or parties whatsoever except as therein otherwise provided.

(9) To contract or set over unto some other operative agent or unit, or units, the carrying out of the operations or work of manufacturing lumber and other forest products and drilling for oil, coal, and other minerals.

(10) To convey the trust estate, or any part thereof, to a corporation or corporations and to accept in payment therefor shares of the capital stock or other securities of such corporation, and the trustees shall have control, management, and disposition of all of the trust estate, and shall likewise have control and conduct of all its business, and shall have power to sell, transfer, assign, mortgage, and otherwise dispose of the whole, or any part of the trust estate.

(11) The trustees shall manage and administer the trust estate, sue and be sued, convey and sell, take title to real and personal property, execute all instruments in writing, and generally transact all business which they may deem necessary or proper in the administration of the trust estate, and they may compromise any suits, claims, or demands relating to the trust estate, and may waive or release rights of all kinds.

(12) The trustees may make, adopt, or repeal by-laws, rules, and regulations as they shall deem necessary for the conduct of their business not inconsistent with the terms of the declaration of trust.

The declaration of trust further provides that the trustees shall issue certificates of beneficial interest in the trust estate to be divided into three thousand shares without par value, which said certificates shall evidence the beneficial interest of the certificate holders, and shall always be held to be personal property, and may be transferred only by due assignment and record transfer upon the books of the trust estate. It is further provided

that the owner of these certificates shall be entitled to participate in all distributions of principal and income made to the owners of the shares in the proportion which the number of shares of the owner bears to the total number of shares, but no certificate holder shall have any title, legal or equitable, to the trust estate, real or personal; held from time to time by the trustees; the nature of the certificate holder's interest being only that defined in the instrument. It is further provided that no assessment or other personal liability or obligation shall be made or imposed upon the certificate holders without the consent in writing of each and every one of them, and that neither the trustees, nor any of their officers, agents, employees, or servants shall have the right, power, or authority to act as the agent of any certificate holder, so as to impose any liability or obligation upon him. It is further provided that each trustee shall be indemnified by, and reimbursed from, the trust estate because of any personal liability or damage or loss by him incurred or suffered in the administration of the trust estate or any part or parts thereof, or in the carrying on of any business, or in the doing of any act authorized or permitted by any of the provisions of the declaration of trust, except such as may arise from his willful, personal default; but all such indemnity and reimbursements are limited to the trust estate, and the certificate holders are expressly relieved from any personal liability by virtue of any of the provisions of the instrument. It is further provided that the trust shall not be dissolved, except by resolution of the trustees, and that the trust shall endure for a period of twenty-one years after the death of the second of the two trustees therein named who shall first die, unless terminated earlier for causes provided for in the declaration of trust.

The trustees having taken charge of the property under this declaration of trust, and being engaged in carrying on business thereunder, the state, on relation of its

attorney-general, filed this bill of complaint charging, among other things, that prior to January 1, 1918, the six lumber companies named as defendants owned in the state of Mississippi vast timber interests and lands, and timber and timber rights, located in the counties of Harrison, Hancock, Stone, Lamar, Marion, Walthall, and Pearl River, and that these companies were engaged in the business of sawing lumber, turpentining timber, and cutting, manufacturing, and selling timber, and preparing it to be sold in the markets of the state of Mississippi. It is further charged that the six corporations were individual corporations and engaged in a competitive business, and that, on January 1, 1918, they entered into the agreement called a declaration of trust, and that the taking over of the property thereunder gave the trustees as complete control thereof as if they owned it, and that the power to deal therewith was taken away from the owners for all purposes, and bound up in the hands of the trustees, who took possession thereof and have been operating it since January 1, 1918. It is then charged that the trust agreement is in violation of section 5002, Code of 1906 (section 3281, Hemingway's Code), in that a trust and combine is created; that the agreement constitutes a combination, contract, understanding, and agreement between these corporations to place the control of the business, products, and earnings thereof in the power of the trustees, and to do various other things forbidden by said Code section. The bill prays for summons and garnishment, and that, upon final hearing, the trust be declared to be in violation of said Code section, and also prays for the imposition of a penalty upon the main defendants for the violation of the *anti*-trust laws, and that the declaration of trust be declared void and of no effect, and that the conveyances and declaration of trust be canceled, and contracts made by the trustees thereunder be canceled, and that the defendants be ousted from the state, and a receiver ap-

pointed to terminate and liquidate the business of the defendants.

Certain of the main defendants having entered an appearance, the bill of complaint was dismissed as to the garnishees, and the defendants Edward Hines Lumber Company, Edward Hines Yellow Pine Company, and Edward Hines, C. F. Wiehe, and L. L. Barth, in their individual capacity and as trustees, filed an answer to the bill of complaint, exhibiting a copy of the declaration of trust, and admitting the execution of the trust agreement and operations thereunder, and setting forth with great detail the conditions and history leading up to the organization of the declaration of trust, as well as the purposes to be accomplished thereby. This answer denied that the Wyatt Lumber Company, the Champion Lumber Company, the Wolf River Lumber Company, or the Lumbermen's Mills Company, had any corporate existence at the time the bill of complaint was filed, alleging that these four companies were dissolved and were out of business subsequent to January 1, 1918. They admitted that on or prior to January 1, 1918, the Edward Hines Lumber Company, and the four other companies last above mentioned, and Edward Hines, did hold the legal title to the lands and timber interests and rights in the state of Mississippi, but alleged that they held the same as trustees at all times.

The defendants averred that such title as the parties defendant had prior to January 1, 1918, was held by them as trustees, and then set forth, in detail, the conditions under which these titles were acquired. It is averred that in 1902, and for ten years previous thereto, Edward Hines Lumber Company, an Illinois corporation, was engaged in the retail and wholesale lumber business in the city of Chicago, with Edward Hines as the principal incorporator, and L. L. Barth and C. F. Wiehe associated with him, both personally and as owners of stock in said company, that in the year 1902, having a large surplus

from the earnings of the company on hand, it was decided that the stockholders should acquire sawmills and planing mills, with said surplus, instead of having dividends declared out of same; that, to accomplish this purpose, the stockholders directed the officers of the company to use said surplus as trustees in purchasing such mills and lumber yards; that in performance of this trust, the trustees acquired the Lumbermen's Mills Company, a planing mill, and the Wyatt Lumber Company, another lumber corporation in Chicago, holding the stock therein as trustees for the stockholders of Edward Hines Lumber Company; and that they operated them independently until the formation of the Edward Hines Yellow Pine Trustees, after which these two corporations were dissolved before the institution of this suit. It was further averred that in the year 1904, the Edward Hines Lumber Company had accumulated a further surplus of three million dollars and found it necessary to make some disposition of this surplus, and thereupon it was resolved that said surplus be invested in timber lands wherever the same could be profitably acquired, rather than distribute such surplus in money; that, by proper resolution of the directors and then stockholders, this surplus was turned over to Edward Hines, as trustee for said stockholders, to be invested in timber lands, for their benefit and ownership, the title thereto to be taken in his own name, but as trustee aforesaid. It was further resolved that said trustee could make purchases partly on credit with the pledge of future surplus or dividends necessary to liquidate such obligations, making the sum authorized to be so invested not to exceed the sum of four million dollars. It was further averred that the said Hines accepted the trust, and purchased an acreage in the southern part of Mississippi of about two hundred twenty thousand acres; that, realizing that if he took title in his own name as trustee, in event of his death, it would embarrass the facility of the alienation or sale

of said lands, said Edward Hines determined to take no more of said purchases in his own name than would represent his individual interest and ownership in said trust funds, and that, accordingly, the title to a large part of these lands was taken in the name of the Wyatt Lumber Company, the Lumbermen's Mills Company, the Champion Lumber Company, and the Wolf River Lumber Company. It is also averred that the property acquired in the name of the Wolf River Lumber Company and the Champion Lumber Company was disposed of, and these corporations dissolved before January 1, 1918.

The answer further avers that before January 1, 1918, all property acquired under authority of the aforesaid stockholders' and directors' resolution had been disposed of except about one hundred forty thousand acres then held in the name of Edward Hines, the Lumbermen's Mills Company, the Edward Hines Lumber Company, and the Wyatt Lumber Company, but held in trust for the benefit of the *cestuis que trustent,* the said stockholders and equitable owners; that for the purpose of utilizing these Mississippi lands then remaining undisposed of, and for the purpose of defining the powers and duties of the trustees who had been authorized to invest the surplus funds of the Edward Hines Lumber Company, a form of declaration of trust to be executed by Edward Hines, L. L. Barth, and C. F. Wiehe was agreed upon; that upon the execution of this declaration of trust all these properties which had been held by Edward Hines, the Edward Hines Lumber Company, and the other corporations, for the benefit of the persons for whom the said Hines, Barth, and Wiehe were trustees, were turned over and conveyed to said Hines, Barth, and Wiehe, as trustees under the name of Edward Hines Yellow Pine Trustees, with the powers and duties, and for the purposes, as fully set out in the declaration of trust hereinbefore referred to; that said declaration of trust placed no property in the hands of said Hines, Wiehe, and

Barth which was not already there, either directly or by representation. It is further averred that this declaration of trust served the purpose of defining the powers, duties, and obligations of the trustees, making definite and certain that this property was being held by said trustees, not for themselves, but for certain beneficiaries described and indicated in said declaration of trust; that it did not extend the powers of the trustees theretofore exercised in the state of Mississippi, but limited them; and that it absolutely bound the trustees to convert into money, and to liquidate and distribute the trust estate as rapidly as practicable, and to the expeditious accomplishment of this purpose all the provisions of the declaration of trust were made to conform.

After the conclusion of the evidence, the complainant amended its bill so as to charge the following:

"Complainant charges that, long prior to the day of execution of the declaration of trust and prior to the date on which the several defendants conveyed and assigned their property to the trustees therein, the Edward Hines Lumber Company, an Illinois corporation, had accumulated about three million dollars in cash as surplus, and its stockholders, board of directors, and officers agreed between themselves that said surplus money should be declared the property of the stockholders in their individual capacity, and the stockholders, being a large number of persons, and being more than two, agreed among themselves that said money should be intrusted to certain persons named by them as trustees, and they also agreed that such trustees with said money should enter into the state of Mississippi and there purchase for cash and on credit two hundred twenty thousand acres of timber land of a greater value than four million dollars, and said trustees, to-wit, Edward Hines Lumber Company, Lumbermen's Mills Company, Wolf River Lumber Company, Champion Lumber Company, and Wyatt Lumber Company, with use of said funds and

other funds borrowed for that purpose, did come into Mississippi and engage in the business of purchasing and did purchase said two hundred twenty thousand acres of timber land at a cost of about four million dollars, and of a greater value than that sum, and said property was conveyed to said trustees,. and, in accordance with the records in Mississippi, they appeared to be the owners thereof, and in law they were the owners thereof as trustees, and afterwards, about January 1, 1918, still carrying out the original trustee agreement and still furthering the same business provided for thereunder, and supplementing and enlarging the same for the additional purposes shown in the trust agreement hereinafter mentioned, the said defendants, the stockholders in Edward Hines Lumber aforesaid, in their individual capacity, and the beneficial owners under said trusts created prior to January 1, 1918, entered into and caused to be executed and delivered the trust agreement and deed of conveyance exhibited herewith as Exhibits A and B, and that since the execution of said two instruments the trustees therein named, as such, have taken possession and title to all of said property, and have sold and purchased other property, have built and maintained large manufacturing plants, have produced and sold many millions of feet of lumber, have purchased and are now operating a common carrier railroad, in fact, have continuously and constantly and daily engaged in carrying on and controlling all of the foregoing as the business of said beneficial owners by virtue of their powers as trustees, in violation of the public policy and statutes of the state of Mississippi, the *anti*-trust statutes (section 5002 of the Mississippi Code of 1906), and by reason thereof have incurred the penalties provided by section 5004 of said Code, at least from the time of execution of said trust agreement on or about January 1, 1918, down to the date of bringing this suit; all of the said acts charged in

the original bill and in this amendment being inimical to the public welfare.''

Thereupon the defendants amended their answer, admitting, among other things, that long prior to the declaration of trust the Edward Hines Lumber Company had accumulated about three million dollars in cash, and that said sum was intrusted to Edward Hines, as trustee, to use same, as well as an additional sum of one million dollars, for the purpose of investment, and that said trust was performed, and the trustee did purchase certain lands in the state of Mississippi in the name of the Edward Hines Lumber Company, the Lumbermen's Mills Company, the Wolf River Lumber Company, the Champion Lumber Company, and the Wyatt Lumber Company, but charges that said lands so purchased were the property of the individual stockholders, as shown in the original answer, and that the said Hines, Wiehe, and Barth owned the greater part of said fund; and admitted that, according to the records of the state, the corporate defendants and Hines appeared to be the legal owners of the land on January 1, 1918, but averred that they had no real or equitable interest therein. They admitted that since the execution of the conveyance and the declaration of trust, the trustees have taken possession of and title to all the property therein conveyed, and admit that the said trustees, in the performance of their trust, have sold and purchased other property, have bought and maintained large manufacturing plants, have produced and sold many millions of feet of lumber, and they admit that said trustees are operating a common carrier railroad under a certificate issued by the Interstate Commerce Commission and the Railroad Commission of the state of Mississippi, and that they have continuously and constantly been engaged in carrying on, controlling, managing, and operating said trust estate and the business intrusted to them.

The bill of complaint charged that the declaration of trust constituted a combination, contract, understand-

ing, and agreement between the defendants (1) to place the control of the business, products, and earnings thereof of these corporations in the power of trustees; (2) that the said corporations and the holders of the certificates of stock thereof have issued, own, and hold the certificates of stock of a trust and combine; (3) that the effect of this agreement and its purpose is to increase and forestall a commodity; (4) it is intended to limit, increase, and reduce the price of a commodity; (5) it is intended to limit, increase, and reduce the production or output of a commodity; (6) it is intended by this agreement to monopolize this business; (7) and to hinder competition in the production, importation, transportation, sale, and purchase of a commodity; (8) that by this agreement power is given to persons other than the owners, their proper officers, agents, and employees, to dictate and control the management of the business; (9) it unites and pools interests in the importation, manufacture, production, transportation, and price of a commodity; all of which are in violation of section 5002, Code of 1906 (section 3281, Hemingway's Code); and by the amendment to the bill it is charged that all the acts charged in the original bill and the amendment are inimical to the public welfare.

At the hearing of the cause, the conveyance and declaration of trust hereinbefore referred to were offered in evidence, and the defendants offered the testimony of various witnesses to establish the facts and conditions leading up to the execution of the declaration of trust, as averred in the answer. This testimony is uncontradicted and it establishes the averments of the answer as to the history of events leading up to the organization of the declaration of trust, and shows that since the organization thereof the trustees have been actively engaged in carrying on business under the provisions thereof; that they have sold large bodies of land and timber; that they have established large sawmills and lumber

manufacturing plants, and have carried on all business necessary or incident to the successful operation of large lumber manufacturing plants, and have operated an intrastate common carrier railroad.

The evidence tends to show, and the chancellor found, that the operations of the defendants under the declaration of trust are not in restraint of trade in any manner,. and that the results of such operations have been to transform a vast acreage of pine forests into prosperous settlements; to parcel out among the people lands suitable for cultivation and improvement; to promote the establishment of farms, homes, schools, and churches; to give employment to a large number of people; to build and develop villages and towns; and promote the general progress and business prosperity of the entire territory adjacent to their operations.

At the conclusion of the hearing of the clause, the chancellor rendered a final decree, finding that the declaration of trust is not *per se* in violation of the *anti*-trust statutes of the state, or inimical to the public welfare of the state, and that the business and operations conducted by the defendant trustees under the declaration of trust are not in fact inimical to the public welfare of the state of Mississippi, and that the complainant is not entitled to the relief prayed for, and dismissed the bill of complaint and the amendments thereto. From this decree, this appeal was prosecuted.

The bill of complaint charges that the agreement evidenced by the declaration of trust constitutes a combination, contract, understanding, and agreement to do practically all the acts which constitute a violation of our *anti*-trust statutes, but in the brief and argument of counsel for the appellant their position seems to be limited to the contention that the contract or agreement in question violates those provisions of our statute defining unlawful trusts and combinations in restraint of trade, which declare void and unenforceable in the courts all

contracts, expressed or implied, "between two or more persons, corporations, or firms, or associations of persons, or between one or more of either with one or more of the others, . . . in restraint of trade;" or "to hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity;" or "to engross or forestall a commodity;" or "to place the control, to any extent, of business or the products and earnings thereof, in the power of trustee, by whatever name called;" or "by which any other persons than themselves, their proper officers, agents and employees shall, or shall have the power to, dictate or control the management of business." Code 1906, sections 5002 and 5003 (Hemingway's 1917 Code, sections 3281 to 3285, inclusive).

After listing the various constitutional and statutory provisions conferring powers, and placing restrictions or inhibitions upon corporations, counsel for the appellant advances the contention, first, that the Constitution of this state has declared a public policy regulating the activities of corporations, all of which will be futile if declarations of trust placing business in the hands of trustees carrying all the immunities and advantages of corporations are to be permitted to operate free from the restrictions imposed by the Constitution, and, second, that in laying the inhibitions on corporations a public policy was declared which will apply to any form of organization having those characteristics of a corporation which are deemed to require the restrictive statutes, and since, from these restrictive statutes, it appears that certain of the operations of these trustees and other operations possible under the declaration of trust are positively against the declared public policy of the state, the effect of its operation on the public welfare and the purposes of its trust benefits are not open to consideration. In discussing this question of public policy, and the exercise by the trustees of powers, rights, and privileges

usually incident to corporate existence only, particular emphasis is laid upon the provisions of the trust agreement relieving, or attempting to relieve, the trustees and the holders of the certificates of beneficial interest of all personal liability for any debt, damage, judgment, or decree arising out of the operations of the trust, and limiting the enforcement of all such obligations to the trust estate.

The trust agreement here involved seems to be patterned after what is known as the "Massachusetts Trust," which the supreme court of the United States, in the case of *Hecht* v. *Malley*, 265 U. S. 144, 44 S. Ct. 462, 68 L. Ed. 949, has described as a form of business organization consisting essentially of an arrangement whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may, from time to time, be the holders of transferable certificates issued by the trustees, showing the shares into which the beneficial interest in the property is divided. In determining whether or not the trust agreement here involved violates the public policy of this state, it is not necessary to decide whether the declaration and the relations thereby created bring it within the classification of a partnership or joint-stock company, or within the designation of a strict or pure trust. It will be of advantage, however, to keep in mind that the courts generally, in determining the character of these business trusts, have regarded them as belonging to one of these classes; the test or rule applied by the courts in determining that question usually being that, if the holders of the beneficial certificates retain control over the trustees and have some authority as to the conduct of the business, the trust is classed as a partnership, while, if they have retained no control over the trustees, and are not in fact associated in the actual carrying on of the business, and the absolute power of control is vested in the trustees, it is classed as a pure or strict trust.

The power to invalidate contracts or agreements on the ground that they violate public policy is far reaching and easily abused, and this court is committed to the doctrine that the public policy of the state must be found in its constitution and statutes, "and when they have not directly spoken, then in the decisions of the courts and the constant practice of the government officials." *U. S.* v. *Trans-Missouri Freight Ass'n,* 166 U. S. 340, 17 S. Ct. 559, 41 L. Ed. 1007. In the case of *Orrell* v. *Bay Manufacturing Co.,* 83 Miss. 800, 36 So. 561, 70 L. R. A. 881, in discussing the question of public policy, the court said:

"The inference clearly to be drawn from the cases last cited and the authorities on which they are based is this, that contracts are not in violation of the public policy of the government unless either prohibited by express terms or the fair implication of a statute, or condemned by some decision of the courts construing the subject-matter. In the instant case the contract sought to be enforced is not violative of any statute, and, so far as we have been able to ascertain, has never been condemned by the decisions of any Federal court nor by the ruling of any department or official of the government, and does not of itself thwart the policy of the government."

Applying this doctrine, and looking to the statutes conferring powers and placing inhibitions upon corporations, let us see wherein the operations of this business organization contravenes the public policy of the state as manifested in those particular statutes. Under our statutes, corporations may be organized to engage in and carry on any legitimate business, and, except to a very limited extent, any business that may be carried on by a corporation may likewise be carried on by an individual or by a partnership. Under the declaration of trust the trustees are not vested with any rights or authorized and empowered to carry on any business or do any acts in reference to the affairs of the estate that could not be done by an individual or by a partnership, and, in so far

as the statutes touching the organization and operation of corporations are concerned, we can see nothing which declares a public policy that is violated by the declaration of trust. It is true that under the terms of the trust agreement the trustees and the beneficiaries are relieved of personal liability for debts and other obligations incurred in the operation of the property, and liability for such debts and obligations is limited to the trust property, but this provision, if invalid, would not invalidate the entire trust agreement. If this provision contravenes any public policy founded upon the statute which confers limited liability only upon the stockholders of a corporation, and is therefore invalid, as to which we express no opinion, that fact may be determined in a proper proceeding, and the provision held to be ineffectual to accomplish the purpose sought thereby.

The legality of a trust estate created in the form of the one now before us does not seem to have been heretofore called in question in this state, but, as bearing on the question of whether this trust violates any public policy of the state, it will be helpful to consider certain statutes and decisions of this court touching the subject of trust estates generally.

Section 2779, Code of 1906 (section 2438, Hemingway's 1927 Code) provides that trust estates shall be subject to execution. Section 4780, Code of 1906 (section 3330, Hemingway's 1927 Code) requires that declarations or creations of trusts in land shall be made and manifested in writing, signed by the party who declares or creates such trust, while section 4781, Code of 1906 (section 3331, Hemingway's Code) provides that all grants, assignments, or transfers of any trust shall likewise be in writing.

The Estate Tax Act of 1924 (chapter 133, Hemingway's 1927 Code) clearly recognizes the existence of trust estates within this state, and makes provision for the collection of inheritance taxes thereon upon the death of the beneficiary.

Chapter 132, Laws of 1924 (chapter 131, Hemingway's 1927 Code) is an "act levying an income tax on individuals, partnerships, corporations, associations, trusts, and estates," and this act specifically recognizes and defines trust estates and provides for the payment of taxes on the income of such trust estates.

That business may be lawfully carried on by or through the agency of trustees is specifically recognized by chapter 185, Laws of 1924, which is entitled, "An act to provide for service of process upon nonresident trustees doing business in Mississippi by providing for service upon agents of such trustees," and it provides that service of process may be had upon nonresident trustees doing business in this state in the same manner that it is served upon foreign corporations.

In the case of *Stansel* v. *Hahn,* 96 Miss. 616, 50 So. 696, a trust was created by will, which placed the property of the decedent in the hands of two trustees "to hold, manage, and dispose of, collecting the rents and incomes, changing the investments, selling, and conveying the whole or any portion thereof from time to time, and doing any and all things necessary for the prudent management of said property, and for the carrying out of the term of said trust." The legality of this trust was not attacked, but the validity thereof was recognized by the court, and the terms thereof were enforced.

In the case of *Natchez* v. *Minor,* 9 Smedes & M. 544, 48 Am. Dec. 727, this court speaking through Chief Justice SHARKEY, held that a deed conveying realty to the president of an unincorporated company and his successors in office, in trust and for the use and benefit of the stockholders and their heirs, in proportion to the number of shares owned by each, was valid, and that "such a trust would undoubtedly be enforced."

In the case of *Board of Trustees* v. *Odom,* 100 Miss., 64, 56 So. 314, there was an attempt to create a trust in

land, by a conveyance of property and the appointment of trustees with plenary powers, and it was held that the trust did not take effect for the sole reason that the instrument creating it was not acknowledged and filed for record as required by section 4780, Code of 1906 (section 3330, Hemingway's 1927 Code).

In the case of *Fearn* v. *Mayers*, 53 Miss. 458, four persons conveyed to two trustees "a large amount of real and personal property, situated in the states of Alabama, Mississippi, and Louisiana, for the purpose of liquidating certain liabilities therein specified. When these debts had been extinguished, the surplus property remaining was to be reconveyed to the grantors, or sold for division of the proceeds among them, as might then be deemed advisable." The validity of this trust was recognized in an opinion by Justice CHALMERS.

In the case of *Hiserodt* v. *Hamlett*, 74 Miss. 37, 20 So. 143, in discussing the creation of a trust, this court said that:

"One may do what he will, within legal limits, with his own. He may declare a trust absolute, never thereafter having, in anywise, the right to interfere with it, or he may declare a trust revokable upon a named contingency."

There are many other decisions of this court which have incidentally considered and discussed the validity of trust estates and the powers of trustees thereunder. It is true that these cases have had reference to simple trusts created by will or deed; but the trust agreement here involved is merely an elaboration of a simple trust, and we see no reason why the rules applied to it should be different from those applied to a trust of simpler form, and after a careful examination of the decisions of this court, and statutes placing inhibitions upon corporations, as well as others, we have reached the conclusion that the trust agreement does not violate any public policy evidenced by such statutes or decisions, unless it violates

the public policy declared in our *anti*-trust statutes which are designed to preserve to the people of this state the benefits arising from competition in business by prohibiting combinations which tend to create a monopoly, and which are in restraint of trade, and therefore inimical to the public welfare.

Upon this point it is contended by appellant that the trust agreement is illegal and void for the reason that it comes particularly within the prohibition of subdivisions (g) and (h) of section 5002, Code of 1906 (section 3281, Hemingway's 1917 Code), which provides that a trust and combine is a combination, contract, understanding, or agreement, expressed or implied, between two or more persons, corporations, or firms, or associations of persons, or between one or more of either with one or more of the others—"(g) to place the control, to any extent, of business or the products and earnings thereof, in the power of trustee, by whatever name called;" and "(h), by which any other persons than themselves, their proper officers, agents and employees shall, or shall have the power to, dictate or control the management of business; . . . and is inimical to the public welfare, unlawful and a criminal conspiracy." The record discloses, and it is admitted, that under the terms of the trust agreement the control of business, and the products and earnings thereof, have been, to a large extent, placed in the hands of trustees, and, if that fact alone renders the agreement unlawful and a criminal conspiracy, the inquiry is ended. However, in considering the question as to whether or not the instrument is condemned by the fact alone that it comes within the strict letter of the statute, although it may not in fact be in restraint of trade, or tend to create a monopoly, or be in fact inimical to the public welfare, we have the aid of numerous decisions of this court in which the question is fully discussed and the applicable doctrine announced. In these numerous cases every phase of the *anti*-trust laws of

the state is ably and exhaustively discussed, and, realizing the hopelessness of attempting to improve upon these discussions, we shall content ourselves with quoting liberally therefrom the principles and rules therein announced and established. The case of *Yazoo & M. V. Railway Co.* v. *Searles,* 85 Miss. 520, 37 So. 939, 68 L. R. A. 715, is probably the leading case upon this subject in this state, and one of the ablest discussions of the subject that has come under our observation. In that case, in discussing the legislative purpose in enacting the *anti*-trust statutes, the court said:

"An analytical study of this section demonstrates that it was the legislative design to prohibit and provide punishment for the formation of any criminal conspiracy by which the interest of the public might be in any manner injured or jeopardized, whether such combination was intended to be in restraint of trade, to limit, reduce, or increase the price or the production of any commodity, or to hinder competition in the importation, manufacture, transportation, sale, or purchase of any commodity, or to do certain other enumerated acts, which would, in the judgment of the legislature, prove prejudicial to the interest of the public or any part thereof, or of any individual. . . . The design of the legislature was to protect the public, not to unlawfully restrict the transacting of business by either corporations or individuals. The various kinds of legitimate business rendered necessary by the multiform demands of public convenience, the manifold callings which are an incident of this progressive age, all demand that the individual right of contract shall be given full sway, conditioned only that the rights of the public and the welfare of the people and the public policy of the state shall be held sacred. Says TERRAL, J., in *Houck* v. *Wright,* 77 Miss. 483, 27 So. 617: 'The legislature, by the chapter on trusts and combines, did not intend to debar a person from conducting his own private business according to his own

judgment.' In this connection, WHITFIELD, J., in [*Fire*] *Insurance Company* v. *State,* 75 Miss. 24, 22 So. 99, says: 'It (the legislature) therefore prohibited any trust whose object was to place the control of any business in the power of trustees, where the effect of such trust should be to injure the public or any particular person or corporation in this state. Such legislation has become very general in the United States, owing to the pernicious results of such trusts.' "

In the same case, in a further discussion of the purposes of the legislature in enacting these statutes, and the benefits sought thereby to be preserved to the people of the state, the court said:

"The benefits which the legislature sought to secure to the people of the state were those which naturally flow from competition in business. In order to insure these benefits, it was provided that any contract entered into between two or more persons or corporations should be unlawful if it in any wise restrained or decreased the advantages known to arise from competition in business, whether such contract was expressly and openly in restraint of trade, or whether, by its effect, it was indirectly liable to reduce or increase prices, to increase or reduce production, to engross or forestall or to hinder competition in production, manufacture, transportation, sale, or purchase of any commodity. All contracts, whether expressed or implied, which would necessarily or probably have any of the effects therein forbidden were declared to be violative of the announced public policy of the state in that they inevitably tended to reduce the benefits sought to be insured by the act. . . . But at last the test, and only test, is not what the intent of the parties may be, not what form the combination has taken, but what will its probable effect be? If unlawful or oppressive, if obnoxious to public policy, if inimical to public welfare, they will be denounced and punishment meted out to every participant; otherwise, courts will not

limit or restrict the inalienable right of contract, and will not interfere unless the violation of law be apparent or the apprehended evil effect assume some tangible form.''

Again, in the *Searles case, supra,* in discussing the exact point now presented for decision, the court said:

''It is contended that all combinations or contracts, without regard to purpose, intent, or effect, by which the control, to any extent, of business, or of the products and earnings thereof, is placed within the power of trustees, or by which other persons than the contracting parties or their proper officers, agents, or employees are given the power to dictate or control the management of business, are prohibited by the terms of the act. If this narrow construction is in fact the legislative intent, the entire law would be open to the just criticism of being a wholly unnecessary, if not an unwarranted, invasion of the inherent right of the citizen to deal with his own as he pleases, if without injury to others. *Gage* v. *State,* 24 Ohio Cir. Ct. R. 724. Carried to its logical conclusion, this argument would prevent any two or more individuals engaged in business from employing the same agents or representatives, or from placing in the hands of the same individual the right to control their separate business. . . . We cannot adopt or sanction this restricted view. The true interpretation, in our judgment, is that only such contracts and agreements (within the purview of the paragraphs now under review) are forbidden which, on account of their natural result, are obnoxious to public policy, of which, in themselves, are by necessary effect inimical to the public welfare. Practically the same construction has been placed upon the *anti*-trust laws of other states, which, though clothed in different verbiage, contain substantially the same ideas and are designed to attain the same end.''

The court then quoted with approval the language of the supreme court of Montana in the case of *MacGin-*

*nuss* v. *Boston & M. Consol. Copper & Silver Min. Co.,*
29 Mont. 455, 75 P. 95, in which the constitutional and
statutory provisions of that state relating to this sub-
ject were involved, a part of the language quoted being as
follows:

"It was not the purpose of the convention, or of the
legislature, to limit either the term used in the Consti-
tution, or in the statute, by any narrow definition, but to
leave it to the courts to look beneath the surface, and,
from the methods employed in the conduct of the busi-
ness, to determine whether the association or combina-
tion in question, no matter what its particular form
should chance to be, or what might be its constituent ele-
ments, is taking advantage of the public in an unlawful
way. *Harding* v. *Am. Glucose Co.,* 182 Ill. 551, 55 N. E.
577, 64 L. R. A. 738, 74 Am. St. Rep. 189. In each case,
therefore, under these provisions, the nature of the ar-
rangement or combination is a question of fact to be de-
termined by the court from the evidence before it, or
from the vice which inheres in the contract itself."

Again, in the *Searles case, supra,* it is said that:

"Nor is the rule of construction different when applied
to the Federal *anti*-trust statute. 'It is now settled,'
says the circuit court of appeals," that "this act of con-
gress must have a reasonable construction. It was not
its purpose to prohibit or to render illegal the ordinary
contracts or combinations of manufacturers, merchants,
and traders, or the usual devices to which they resort to
promote the success of their business, to enhance their
trade, and to make their occupations gainful, so long as
those combinations and devices do not necessarily have
a direct and substantial effect to restrict competition in
commerce among the states.' *Phillips* v. *Iola Portland
Cement Co.,* 125 F. 594, 61 C. C. A. 19. . . .

"The object of the Federal *anti*-trust statute is to pre-
serve to the people of the entire nation the benefits aris-
ing from competition in business by preventing monop-

olies and contracts in restraint of trade in regard to commerce among the states. The object of the state legislation is to preserve to the people of the state the identical benefits by preventing monopolies and contracts in restraint of trade in regard to domestic commerce. To vitiate a combination such as the statute condemns, it is essential to show that by its necessary operation it tends to restrain trade or commerce, or tends to create a monopoly in such trade or commerce and to deprive the public of the advantages that flow from free competition, the trade or commerce so affected being domestic or interstate or foreign, according to whether the state or Federal statute is invoked. But to vitiate the combination the effect must be detrimental to the interests of the public under either statute. . . .

"We cannot convict the legislature of having intended to prohibit the very many and constantly increasing number of perfectly legitimate contracts or combinations to which the growth of business or the exigencies of commerce give rise, and which are constantly multiplied by new avenues continually being opened by the thrift, progress, and invention of this era of complex business enterprises. Keeping in mind the clear statement before quoted from [*Fire*] *Insurance Companies* v. *State, supra,* that only such combinations are forbidden as may have the effect of injuring the public, or some part thereof, or some corporation or private individual, the meaning of the statute and of the paragraphs particularly in question becomes perfectly plain."

In the case of *Cumberland Telephone Co.* v. *State,* 100 Miss. 102, 54 So. 670, 39 L. R. A. (N. S.) 277, it was held, headnote 2, that:

"In determining whether a contract is violative of Code of 1906, section 5002, as amended by Laws 1908, chapter 119, defining a trust as a combination in restraint of trade, the court must consider the contract in the light of the facts explanatory thereof, since the questions involved are questions of both law and facts."

And in discussing the question the court used this language:

"When this statute was enacted, it introduced into the law no new definition of what constituted a 'restraint of trade' or 'a monopoly.' It did not attempt to define either. These are questions to be determined in the light of the facts of each case and under the law relating to same as it stood before the statute was passed; otherwise, there is no guide for the persons charged with the enforcement to be governed by. What does the statute mean when it prohibits contracts 'in restraint of trade?' Does it mean that any contract which in any way restrains trade shall be illegal? If so broad a meaning should be given to the statute as this, it would involve a destruction and disaster to the commercial world never dreamed of by its authors, and not comprehended within the evil intended to be rectified. The statute only intended to include within its provisions those contracts in restraint of trade, those monopolies, and attempts to monopolize that were invalid as against public policy before the enactment of the statute, and under such contracts in relation thereto could not be enforced as between the parties. A contract in reasonable restraint of trade was valid before the enactment of the statute, where its design and purpose is not to create a monopoly, and such contract is valid now 'where it is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public.' . . . The law as to what it now takes to make a contract in restraint of trade to monopolize or attempt to monopolize any business remains the same, but the parties who may sue and the penalties have been broadened. As to what does or does not constitute a monopoly within the meaning of the statute is not always easy to decide. The courts must be left to determine these questions when they arise. The question is one of mixed law and fact of necessity."

In the case of *Standard Oil Co.* v. *State,* 104 Miss. 886, 61 So. 981, where a bill was filed in the chancery court to recover penalties imposed for a violation of subdivisions N and O of the *anti*-trust statutes, it was held that the rule of evidence prescribed by said subdivisions, that it shall be sufficient to make out a *prima-facie* case of a violation of said sections to show that the prohibited acts were done, did not relieve the complainant of the necessity of charging that they were done for the purpose of destroying competition.

In the cases of *Cumberland Telephone Co.* v. *State,* 100 Miss. 102, 54 So. 670, 39 L. R. A. (N. S.) 277, *Sivley* v. *Cramer,* 105 Miss. 13, 61 So. 653, and *Yazoo & M. V. Railroad Co.* v. *Crawford,* 107 Miss. 355, 65 So. 462, L. R. A. 1915C, 250, it was held that our *anti*-trust statute was "only intended to include within its provisions those contracts in restraint of trade" which "were invalid as against public policy before the enactment of the statute;" and in the latter case the court reaffirmed the statement in the case of *Houck* v. *Wright,* 77 Miss. 483, 27 So. 617, that:

"The legislature, by the chapter on trusts and combines, did not intend to debar a person from conducting his own private business according to his own judgment."

In the case of *Brown* v. *Staple Cotton Association,* 132 Miss. 859, 96 So. 849, the court had before it a contract between an association of producers of long staple cotton and its members by which the members of the association placed the control of the marketing of all cotton raised by them in the hands of the association, and the court there held, as stated in headnote 1, that sections 5002 and 5003, Code of 1906, as amended (sections 3281 to 3285, inclusive, Hemingway's 1917 Code), "defining unlawful trusts and combinations in restraint of trade and declaring all contracts made in furtherance thereof, whether expressed or implied, void and unenforceable,

does not prohibit any and all contracts in restraint of trade, but only those which in their effect are inimical to the public welfare. The rule of reason will be applied. There must be an undue and unreasonable restraint of trade.''

In discussing the question, the court said that:

''If our *anti*-trust statute is to be applied literally, perhaps this marketing contract comes within its provisions. Every member of the appellee association by this contract (which is not only a contract with the association but with each member thereof) has placed the control to *some extent* of the staple cotton produced or controlled by them in the hands of appellee. Therefore the question is whether our *anti*-trust statute should be construed according to its literal terms regardless of the results, or whether it is to be construed in the light of reason and with the view of promoting the public welfare.''

And, after citing and analyzing many authorities from this state and elsewhere, the court answered the question in the following language:

''It will be seen that this court in construing our statute prohibiting monopolies has applied the rule of reason, as has the supreme court of the United States in construing the Federal statute against monopolies, as have also the courts of other states in passing on co-operative marketing contracts substantially the same as the one here involved. There must be an unreasonable or undue restraint of trade. It must be such a restraint of trade as is detrimental to the public interest. A statute will not be construed so as to lead to unreasonable or absurd results if that can be avoided. The legislature must be given credit, if the language of the statute in question will permit it, of legislating in the public interest. It is inconceivable that it was intended by our *anti*-trust statute to condemn any and all contracts between two or more persons which might have the effect to hinder the freedom of trade to the very smallest extent. Such a

construction, as it will be seen at once, would lead to absurd results. It would destroy to a large extent the public welfare instead of promote it."

In the case of *Jackson* v. *Price,* 140 Miss. 249, 105 So. 538, the court held that under our *anti*-trust statutes, trusts, combinations, contracts, and agreements, although they may result in restraint of trade, are not unlawful, unless they are also inimical to the public welfare, and, in so holding, used the following language:

"All contracts and agreements in restraint of trade are not violative of our *anti*-trust statute. It is only those (to use the language in part of section 198 of the Constitution) that are 'inimical to the public welfare.' Section 198 of the Constitution is a mandate to the legislature to enact laws to prevent trusts, combinations, contracts, and agreements inimical to the public welfare. Whether the legislature has the power to go beyond the constitutional mandate and prohibit trusts, combinations, contracts, and agreements which are not inimical to the public welfare has not been decided. It has been decided, however, that the legislature in adopting our *anti*-trust statute has not yet gone beyond the constitutional mandate. *Brown* v. *Staple Cotton Co-operative Association,* 132 Miss. 859, 96 So. 849; [*Cumberland*] *Telephone Co.* v. *State,* 100 Miss. 102, 54 So. 670, 39 L. R. A. (N. S.) 277; *Sivley* v. *Cramer,* 105 Miss. 13, 61 So. 653.

"Our court has, as has the supreme court of the United States in construing the Sherman Act (U. S. Comp. St., section 8820 *et seq.*), applied the rule of reason in construing our *anti*-trust statute. It has been held by this court before the decision of *Brown* v. *Staple Cotton Cooperative Association,* *supra,* that trusts, combinations, contracts, and agreements, which were not inimical to the public welfare, were not violative of our *anti*-trust statute. But, in the Brown case, this question was considered again and discussed fully, and that rule reaffirmed in unmistakable terms. The court there said that

the statute did not outlaw all contracts in restraint of trade, but only such as in their nature and effect were inimical to the public welfare; that there had to be an undue and unreasonable restraint of trade injurious to the public good.''

In the case of *Gano* v. *Delmas,* 140 Miss. 323, 105 So. 535, the court said that: ''·Certainly it [the contract involved] was a partial restraint of trade. The contract, if carried out, would operate to restrain trade to some extent. But that is ·not the criterion. It was held in [*Cumberland*] *Telephone Co.* v. *State,* 100· Miss. 102, 54 So. 670, 39 L. R. A. (N. S.) 277, *Sivley* v. *Cramer,* 105 Miss. 13, 61 So. 653, and *Pearson* [*Jackson*] v. *Harry Price and Wife,* 140 Miss. 249, 105 So. 538, the opinion in which latter case is handed down with this opinion, that all contracts and agreements in restraint of trade are not violative of our *anti*-trust statute; that it is only those which are inimical to the public welfare. Conceding that the contract involved is in restraint of trade, the question, therefore, is whether it is such a restraint of trade as is inimical to the public welfare.''

After having announced these legal principles, the court proceeded to determine from the contract itself and the evidence bearing therein and on the operations thereunder, whether the contract resulted in such a restraint of trade as is inimical to the public welfare, and held that it was not inimical to the public welfare, and was therefore valid.

Having thus collated the decisions of this court bearing upon the rules to be applied in such cases, we come to a consideration of the contract or agreement here involved to determine from its terms, effects, and the nature and effects of the operations carried on and permissible thereunder, whether it is such a restraint of trade, or so hinders competition, as to be inimical to the public welfare.

The record here discloses that the directors and stockholders of the Edward Hines Lumber Company, an Illi-

nois corporation, voted to turn over a large surplus from the earnings of the company to Edward Hines, as trustee, to be invested by said trustee, instead of paying said surplus to the said stockholders in the form of a dividend, the said stockholders to be beneficially interested in any investment so made by the trustee in proportion to the amount of stock owned by each of them in said company. In the execution of this trust Hines purchased a large quantity of pine lands in this state, taking the title thereto in his own name and in the name of certain Illinois corporations, as trustee, however, for the stockholders of the said Edward Hines Lumber Company. It is perfectly manifest that the nonresident beneficiaries of this surplus fund violated none of the *anti*-trust statutes of this state in turning this fund over to a trustee for investment, and likewise that Edward Hines, as such trustee, violated no such statute by purchasing land and timber in this state. The title to these lands remained for some time in the name of these trustees; the powers and duties of the trustees being defined only in the resolution of the said stockholders which directed that this surplus should be paid to the trustee for investment. When, in the judgment of the trustee and the beneficiaries, it became necessary and desirable to dispose of these lands and liquidate the trust estate, the declaration of trust involved in this suit was prepared and executed. By the terms of this instrument the powers, duties, and obligations of the trustees named therein with reference to the trust estate are defined and set forth at great length and in great detail. The trustees are granted plenary powers to handle, dispose of, and deal with, the property, and to establish and carry on manufacturing enterprises and such other classes or kinds of business as may be necessary or expedient to accomplish the purposes of the trust agreement, which are therein stated to be "to convert into money and to liquidate the trust estate as rapidly as practicable." And to that end it is declared that the trustees shall pro-

ceed as soon as practicable, in their judgment reasonably exercised to the disposition, conversion, and liquidation of said property in the manner deemed by them for the best interest of the certificate holders; and the trustees are prohibited from engaging in any business not reasonably necessary to such disposition, conversion, and liquidation, and they are prohibited from acquiring with the trust funds or property other or further property except such as may be reasonably necessary or adapted to or convenient for said liquidation. Under the trust agreement the powers, rights, and privileges conferred upon the trustees touching the trust property are not other, different, or greater than those which may be lawfully exercised by an individual in dealing with his own property, or by a partnership in dealing with partnership property, and, if the agreement is to be declared invalid, its illegality must be manifested in the nature and effects of the operations carried on or permissible thereunder.

At the time of the execution of this declaration of trust neither the trustees nor the beneficiaries of the trust were engaged in any business in this state, except occasional and incidental sales of land and timber. The activities of the trustees, as authorized by the trust agreement, were to be devoted to the establishment of new business enterprises and the development of idle and unproductive forest lands in furtherance of the general scheme and purpose of liquidating the estate and distributing it to the beneficial owners thereof. In pursuance of the powers given and in discharge of the duties imposed by the trust agreement, the trustees have established large sawmills and lumber manufacturing plants, and have engaged in the business of selling the products of these plants in the markets of the United States and foreign countries. The great bulk of such products are sold in markets outside of this state, and, while the operations of these trustees may to a limited extent affect the supply of lumber in the markets of the world, the general

tendency of such operations is to increase competition in the lumber trade and thereby promote the general public welfare. As a natural incident to the operation of these large sawmills and other plants for the manufacture of the by-products of the pine forests, opportunities of the public for profitable business ventures have been multiplied, new towns and villages have been established and developed, the growth and prosperity of old and established towns and communities have been greatly stimulated, employment has been given to large numbers of people, prosperous settlements have been established where formerly there was only a vast acreage of idle and unproductive pine forests, lands suitable for and susceptible of cultivation and improvement have been and are being parceled out among the people for cultivation as farms and the establishment of homes, hospitals, schools, and churches have been established and supported on and adjacent to these lands, and the general progress and business prosperity of the entire territory adjacent to these lands have been promoted by the operations thereon. As well expressed by the distinguished chancellor in his opinion in this case, which was made a part of the record, "the property, consisting of something over one hundred thousand acres of woodland, is being sold and developed, the timber manufactured into lumber and marketed, and the lands parceled out for cultivation and improvement. To this extent industry has laid hold upon a wilderness and is converting it into a prosperous settlement. The people, we are informed, are contented, no one oppressed, and all afforded opportunities such as occupation and employment offer to those who are thrifty, ambitious, and industrious. Homes and farms, it seems, are succeeding the operations of mill and factory, and sentiments of education, religion, and humanity are finding expression among the established institutions of the community. The trustees in the exercise of their authority to dispose of the

estate have—according to the record here—sought no unfair or inequitable advantage, adopted no policy inconsistent with the basic principles of legitimate commerce, nor attempted to injure by act or example any interest or business, private or public, with which they have dealt. They have builded, it seems, rather than destroyed, and helped rather than hindered the general progress and prosperity of all. "If by their fruits. we are to know them—if substance rather than form is to be the criteria of adjudication—then their conduct has not injured the general welfare, nor has their conduct been violative of either the purpose or the policy of the law."

Neither in the terms, objects, or purposes of the trust agreement, nor in the powers, rights, and privileges conferred thereby, nor in the results or effect of the business operations conducted thereunder or permitted thereby, do we find anything that shows an unreasonable or undue, restraint of trade, or hindrance of fair and free competition, or that is inimical to the public welfare, and we have therefore reached the conclusion that this declaration of trust does not violate the provisions of our *anti*-trust statutes.

There remains to be considered only the question as to whether or not the fact that the trustees own and operate a common carrier railroad renders the trust agreement illegal or violative of our *anti*-trust statutes. In the absence of a statute requiring all persons owning railroads to place them under corporate control, it is well settled that an individual may own and operate a railroad as well as a corporation, and the right of an individual to own and operate a railroad seems to have been recognized by the legislature of this state in section 1594, Code of 1906 (section 1361, Heminway's 1917 Code), wherein a railroad is defined as: "Every person, firm, association of persons or company, whether incorporated or not, who shall own or operate a railroad as a common carrier."

And, again, in section 4891, Code of 1906 (section 7677, Hemingway's 1917 Code), which provides that: "The term 'railroad' includes and applies to every person, firm, association of persons, and company, whether incorporated or not, who or which shall own or operate a railroad as a common carrier; and the term 'company' embraces and applies to every person, firm, association of persons, and company, whether incorporated or not, who or which shall own or operate a telegraph or telephone line, or do an express or sleeping-car business."

Section 197 of the Constitution, however, provides that: "The legislature shall not grant to any foreign corporation or association a license to build, operate, or lease any railroad in this state; but in all cases where a railroad is to be built or operated, and the same shall be partly in this state and partly in another state or in other states, the owners or projectors thereof shall first become incorporated under the laws of this state; nor shall any foreign corporation or association lease or operate any railroad in this state, or purchase the same or any interest therein."

If it should be held that this constitutional provision is prohibitory of the right of an individual or unincorporated association of persons to own and operate an intrastate railroad, which we do not decide, still we do not think the fact that the trustees own and operate such a railroad would render the trust agreement illegal and violative of the *anti*-trust statutes. If, in fact, only a corporation can own and operate an intrastate railroad in this state, the remedy of the state is not a proceeding under the *anti*-trust statutes, but it would seem to be by *quo warranto* under the third paragraph of section 4017, Code of 1906 (section 3012, Hemingway's 1917 Code), seeking a judgment debarring and excluding the trustees from exercising and using the right and franchise so to do, as provided by section 4026, Code of 1906 (section 3021, Hemingway's 1917 Code).

The decree of the court below will therefore be affirmed.

*Affirmed.*